Janice JONES *v.*
ARKANSAS DEPARTMENT of HUMAN SERVICES

04-426                                                                   205 S.W.3d 778

Supreme Court of Arkansas
Opinion delivered March 24, 2005

*Suzanne Ritter Lumpkin,* for appellant.

*Gray Allen Turner,* for appellee.

DONALD L. CORBIN, Justice. Appellant Janice Jones appeals the order of the Pulaski County Circuit Court terminating her parental rights over her daughter, P.J., and placing custody with Appellee Arkansas Department of Human Services (DHS). Appellant raises three points for reversal. The first point raises the issue of the sufficiency of the evidence to support the trial court's decision to terminate her parental rights, while the second and third points raise constitutional issues. This case was certified to us from the Arkansas Court of Appeals as presenting issues of first impression and requiring further development of the law in termination cases. Our jurisdiction is thus pursuant to Ark. Sup. Ct. R. 1-2(b)(1) and (b)(5). We affirm.

The record reflects that on April 11, 2001, when P.J. was six years old, Appellant admitted her to Pinnacle Point Hospital for behavioral problems. The report filed by Dr. Jim G. Aukstuolis reflects that prior to her admission, P.J. had become increasingly disruptive, defiant, belligerent, and combative, both at home with her mother and at school with her peers, to the point of endangering her peers. She was having combative temper outbursts, involving destruction to walls and furniture at home. She was acting impulsively and recklessly without regard for her own safety, and she ran away from home one week earlier. On the day prior to her admission, P.J. threatened to stab herself with a knife and stated that she wished she was dead.

On April 17, 2001, six days after P.J. was admitted to Pinnacle Point, Appellant suffered a massive heart attack and was transported by ambulance to UAMS Hospital, where she was admitted to the cardiac intensive care unit. On April 25, 2001, while Appellant remained in intensive care, DHS placed a seventy-two-hour emergency hold on P.J. The affidavit filed by family services worker Diane Scalfaro reflects that the emergency hold was necessary because P.J. was scheduled to be released from Pinnacle Point on April 25 and there would be no one at home to care for her. Ms. Scalfaro's affidavit also reflects that DHS was familiar with Appellant and her family situation, because in September 2000, DHS received a report of suspected child abuse or maltreatment concerning P.J., particularly environmental neglect, that was later substantiated. Thereafter, a caseworker was assigned to work with the family.

On April 26, 2001, an order granting DHS emergency custody of P.J. was issued by the Pulaski County Circuit Court. The order set a probable cause hearing for April 30. The only

witness at the April 30 hearing was Ms. Scalfaro, who testified to the facts contained in her affidavit. Ted Vandagriff, attorney for Appellant, informed the court that Appellant was still in critical condition. Mr. Vandagriff then stipulated that no services be provided to Appellant, other than visitation with P.J., because of the severity of her health condition.

In an order entered on June 4, 2001, the trial court found that there was probable cause that the emergency conditions that necessitated removal of P.J. from the home continued, and that it would be contrary to the welfare of the child to return her to her home. The court ordered DHS to develop a case plan for the family and find an appropriate foster home for P.J. The court also ordered DHS to provide services to Appellant to maintain her home as it was before her heart attack. Finally, the court ordered written reports on the medical conditions of both Appellant and P.J.

An adjudication hearing was held on June 13, 2001, during which Appellant's attorney stipulated to a finding that P.J. was dependent-neglected. Appellant was not present at that hearing, as she was still recuperating from her heart attack. The trial court received into evidence Appellant's discharge summary from UAMS and P.J.'s discharge summary from Pinnacle Point. The trial court ordered DHS to make application for therapeutic foster care for P.J., and ordered Appellant to follow her doctor's recommendation for treatment. The court also ordered DHS to provide transportation for Appellant to her appointments, if necessary. An adjudication order was entered on July 30, 2001, setting a permanency planning hearing for December 10, 2001.

Appellant was present at the permanency planning hearing with her attorney. The evidence presented during that hearing consisted of testimony from Ms. Scalfaro; the report and case plan from DHS; a report from P.J.'s therapist, Vickie Lawrence; a report from Counseling Services of Eastern Arkansas; and a report from P.J.'s teacher. A permanency planning order was entered on January 10, 2002, in which the court found that returning P.J. to Appellant's custody was contrary to the child's welfare, and that continuation of the child's custody in DHS was in the best interest of the child and necessary for the protection of her health and safety. The court determined that the goal of the case remained reunification, and ordered family counseling. Additionally, the court ordered a complete report on Appellant's medical condition

from her primary-care physician, Dr. Jamie Howard, and ordered Appellant to sign a medical release.

A review hearing was held on June 3, 2002, during which testimony was taken from Felicia Carter, who replaced Ms. Scalfaro as the family services worker on the case. Ms. Carter recommended that P.J. remain in therapeutic foster care and that DHS continue to work with the family. She stated that it was not possible for P.J. to return home at this point because DHS had not received any medical information showing that Appellant was currently physically able to take care of the child. She explained that although she had made several attempts, she had been unable to get the information from Dr. Howard. She stated that Appellant depends on her walker to get around, and that her lack of mobility may be a factor in controlling P.J.'s disruptive behavior. She stated that if P.J. was placed back in the home, DHS would have to take on some of the parental responsibilities, such as transporting the child to school. On cross-examination, Ms. Carter stated that she had no doubt that if P.J. testified, she would say that she wanted to be returned to her mother. She stated that P.J. had not told her so directly, but she had told her that she missed her mother.

Appellant testified that she was currently living at the Our Way apartments in Little Rock, which is a community for disabled and handicapped persons. She said that she currently lived in a one-bedroom apartment, but that she would soon be moving to an apartment with two bedrooms. She said that she shared the apartment with her eighteen-year-old son Andrew, over whom her parental rights had been terminated when he was eighteen months old. She stated that she was getting more mobile, and that she could walk short distances without the walker. She said that she was not under any kind of post-surgical recovery program for her heart, but that she continues to see her endocrinologist for her diabetes. She said that she was doing fine, medically speaking, and that she had not had anymore heart problems. She said that the last time she was hospitalized was in September 2001 for an infection of the skin on her stomach. She said that she is more active and mobile. She said that she was seeing a doctor for depression, who had prescribed medication for her. In addition, she stated that she was also on medication for her diabetes, blood pressure, and seizures. However, she stated that she was not able to afford all of her medication on her disability check, and that Medicaid would not cover it.

Appellant stated that she had attended all of her visitations with P.J., and that they had been having therapy sessions with Vickie Lawrence. She said that Lawrence was helping her set a structure for P.J., telling her what kind of behavior is and is not allowed. She said that Andrew had been included in those family sessions. She also said that Andrew helps her around the house and that he would soon be getting his driver's license and would be able to help transport P.J. to school.

At the conclusion of the hearing, the trial court found that it was still in the child's best interest to remain in DHS's custody. However, the court ordered DHS to conduct a home evaluation on Appellant's apartment. The trial court advised Appellant that it would be in her best interest to wait on the home evaluation until she was actually in the two-bedroom apartment, as it was unlikely that DHS would approve of three people living in a one-bedroom home. The trial court ordered a complete report on P.J.'s therapeutic foster care and reiterated the need for a complete report on P.J.'s treatment and medication, as well as a complete medical report on Appellant, including her current condition, her prognosis, and her ability to care for P.J.

A permanency planning hearing was held on December 2, 2002, at which Dr. Howard testified that Appellant has many medical conditions, namely diabetes, high blood pressure, coronary artery disease, seizure disorder, and morbid obesity. She stated that it was critical for Appellant to eat an appropriate diet and lose weight in order to combat her illnesses. She stated that although Appellant's coronary artery disease was asymptomatic at that time, she needed to follow up her treatment in the cardiology clinic, because she had a stent placed in her artery. At the time of the hearing, there were no records showing that she had done so.

Dr. Howard also stated that Appellant has poor hygiene, due in large part to her size, which was over 400 pounds, that prohibits her from being able to see and reach all the parts of her body. She stated that Appellant had been hospitalized in the past for infections to her skin, caused by her cat's scratches. Dr. Howard stressed that it was extremely important for Appellant to lose weight, exercise, and eat an appropriate diet, as her morbid obesity has a strong impact on her blood pressure, her heart disease, and the integrity of her circulatory system. She stated that she had recommended the services of a dietician to Appellant, but that Appellant had indicated that she would seek such services from her endocri-

nologist. She had also recommended that Appellant maintain a healthier diet, but that Appellant stated that she could not afford an appropriate diet.

Dr. Howard stated that she had minimal contact with P.J. in the past, but that at one time she had received numerous telephone calls from Appellant about P.J. having head lice. At first, she was willing to treat the condition over the phone, by prescribing medication for P.J. However, as time went on, the head lice never seemed to go away, and Appellant kept calling in for new prescriptions. Dr. Howard then stopped prescribing treatment over the phone and realized that there were hygiene issues that needed to be addressed. However, other than the head lice problem, Dr. Howard stated that she had not seen any other signs of neglect in P.J.

Additionally, Dr. Howard testified about Appellant's relationship with her son Andrew. She stated that the last time she spoke with Appellant, Appellant had informed her that Andrew was back in the home. Appellant told her that she had been more or less forced to take him back into the home, and that she was fearful of him because he was abusive to her.

Finally, Dr. Howard opined that it would be very difficult for Appellant to exercise proper care and control over a seven-year-old child. She explained that Appellant was very immobile and had a hard time maintaining good hygiene. She stated that she was concerned that Appellant had poor judgment, given that she had allowed herself to be repeatedly scratched by her cat when she knew it could cause a serious infection. She was concerned about Appellant's priorities as well, given that Appellant had stated that she could not afford to eat appropriate food, like vegetables, but that she could apparently afford to have her cat declawed to avoid getting rid of it.

Ms. Carter testified that she was still recommending that P.J. remain in foster care and that DHS continue working with Appellant. She stated that since the last hearing, Appellant had problems keeping food in her house, and that she had helped her get food from places like Helping Hands. She said that Appellant had informed her that on one occasion, Andrew had stolen her money, so she could not afford food. She stated that Appellant was not ready to care for P.J., as she was still not able to care for herself. She explained that Appellant has to have a home health nurse come in three times a week and help her bathe and clean her house. She

echoed Dr. Howard's testimony that Appellant needed to lose weight, exercise regularly, and improve her poor hygiene. She described Appellant as getting out of breath just from walking around the DHS offices. She also stated that Appellant needed to control her eating, as she was consuming all of her food the first two weeks she gets it, instead of making it last the whole month, until her next disability check. She said that Appellant was constantly calling her and saying that she does not have any food. She also described an incident at the DHS offices in which Appellant had P.J. go around asking the employees for money.

Ms. Carter testified that Appellant's choice of food is not appropriate for her condition, in that she prefers fast food to vegetables. She stated that when she and another caseworker confronted Appellant with the need to change her diet, Appellant informed them that she would eat what she wants. Ms. Carter opined that reunification is possible only if Appellant can better provide for herself by losing weight, eating right, being mobile, and being able to clean her own house, the kinds of things a parent would do.

As far as P.J.'s status, Ms. Carter testified that she had been in therapeutic foster care for over a year and had made some progress, but she still has some of the behavioral issues that she had before, i.e., being oppositional and disruptive. She said that P.J. is very bossy and that she sees her as taking on the mother's role, while Appellant takes on the role of the child. She stated that the family therapy was going well. However, she stated that their therapist had indicated that Appellant was having difficulty understanding why P.J. is in foster care, but that she did not want to talk about it. Instead, she just voiced hostility at DHS.

Finally, Ms. Carter testified that Appellant had refused to submit to a home study, telling the social worker that her attorney advised her not to submit to a home study. She stated that about one month before the attempt, she explained to Appellant the purpose of the study and that it was for her betterment and was not to hurt her. She said that Appellant stated that she did not want DHS in her private life.

At the conclusion of the hearing, Appellant's attorney, Mr. Vandagriff, made a motion to dismiss the matter on the ground that there was no legal reason to keep P.J. from her mother. He argued that the condition that instigated removal of the child from the home, i.e., Appellant's heart attack, was no longer present and that there was nothing but speculation that Appellant was not

physically capable of caring for her daughter. He argued that the court could not keep P.J. from her mother just because DHS thinks she is a poor decision maker about her health management. Counsel for DHS countered that there was overwhelming evidence that Appellant could not take care of herself, let alone a child with behavioral problems. The trial judge took the matter under advisement, indicating that she wanted to study the testimony.

On December 18, 2002, the trial court issued a written order finding that it was not in P.J.'s best interest to be returned to Appellant. The trial court noted that P.J. had been out of the home for twenty months and that reunification had not occurred for several reasons. First, Appellant's medical condition had not improved sufficiently to allow her to care for herself, much less her daughter. Second, prior to Appellant's heart attack, she was unable to adequately care for P.J., hence the reoccurring bouts with head lice. Third, Appellant is unable to provide financially for the child, given that she runs out of food for herself in the middle of the month and has to seek food elsewhere. Finally, the trial court concluded:

> Given all that has been presented in the case, the Court finds that it is not in [P.J.'s] best interest to return home. Ms. Jones cannot adequately safeguard [P.J.'s] health and well-being as she is not capable of caring for herself much less a seven year old child. The evidence establishes that Ms. Jones has not taken any steps to remedy her situation and improve her medical condition so as to be able to care for her daughter. She has had and is receiving services both therapeutically and medically, which if properly followed, would allow her to rehabilitate herself and her life. She is not following the medical recommendations of her doctors despite a court order to do so. The evidence indicates, and Ms. Jones has not presented any evidence to the contrary, that she is not making significant measurable progress toward rehabilitating herself and her life and diligently working toward reunification. Ms. Jones and her attorney are the only ones recommending that [P.J.] go home with her. While the Court does not doubt that Ms. Jones and [P.J.] love one another, Ms. Jones has been given ample time to turn her life around. She has not done so in the past, nor does the Court believe she will in the future. It is in [P.J.'s] best interest that she remain in foster care, and it is necessary for her well being.

Based on the foregoing, the trial court changed the goal of the case to termination of Appellant's parental rights. Additionally, the trial court denied Appellant's motion to dismiss.

On May 23, 2003, the parties were present for a termination hearing. Testimony was taken from one witness, Charles Thigpen, director of the therapeutic foster care program in which P.J. had been placed. He testified that P.J. had been diagnosed with having attention-deficit/hyperactivity disorder (ADHD), oppositional defiant disorder, and disruptive behavior disorder. P.J.'s treatment plan included family and individual therapy, weekly case management with P.J. and her foster parent, and at least monthly evaluations of her medications. At the time of the hearing, P.J. was on four medications to control her ADHD, her mood swings, and her aggressive behavior. P.J. remained disruptive at school and continued to have problems with authority figures in general. The main goal in her therapeutic foster care was for P.J. to develop self-control, to allow her to respond better in stressful situations. Thigpen stated that P.J. has been sort of like a seesaw, making some progress and then having some set backs. One of her main problems is that she likes to be in control, like a young adult. She also has issues with basic things, such as keeping her body clean. Finally, Thigpen stated that he was concerned about the emotional impact that P.J.'s contact with Appellant was having on her. He stated that the child regresses whenever it is time to visit with her mother, both before and after the visits.

On cross-examination, Mr. Vandagriff attempted to question Thigpen about the circumstances of P.J.'s initial removal from Appellant's custody. The trial judge inquired as to where counsel was going with that line of questioning, and she cautioned him that she was not going to allow him to relitigate the finding of dependent-neglected, especially since the parties had stipulated that the child was dependent. After considerable discussion between the judge and the attorneys, Mr. Vandagriff made a motion to be allowed to withdraw from representing Appellant. He contended that if the trial court did not let him pursue that issue, he was being ineffective for his client. The judge reluctantly allowed him to withdraw and stated that she would appoint new counsel for Appellant and continue the termination hearing. The only remaining item of business that the court addressed was the admission into evidence of the court report and case plan.

On October 1, 2003, the termination hearing continued, with Appellant being represented by new counsel, Ms. Katherine Blackmon-Solis. In her opening statement, Ms. Blackmon-Solis asked the court for more time to allow Appellant to fully comply with the court's orders. She explained that previous counsel had a

very different method of practicing law, namely that he encouraged Appellant to fight the system and challenge everything along the way. She stated that Appellant had been advised by previous counsel not to comply with the court's orders or DHS's requests. However, she made a point of stating that she did not believe that Mr. Vandagriff had provided ineffective assistance, only that his methods were different from hers. She stated that her method of practice was to encourage Appellant to fully cooperate and comply with all court orders, so that she could get her daughter back. She stated further that although Appellant had initially resisted her advice, she had been cooperating with her for the past two months. According to Ms. Blackmon–Solis, Appellant had "finally seen the light."

The first witness to testify was Roy Graves, a social worker for Youth Home who had attempted to do a home study on Appellant's home, but had not been allowed inside by Appellant. He said that he explained that a tour of her apartment was necessary in order to do a home study. She then allowed him entry into the home, but would not let him tour it. Even though he reiterated that the study was court–ordered, Appellant would not relent; instead, she told him that her attorney advised that she did not have to allow the home study.

Andrew Schubert, another social worker for Youth Home, also testified that Appellant refused to cooperate with his request to complete the criminal background checks or central registry check. He stated that Appellant refused to sign the papers, so he left the home. He stated that she told him she did not want to do a home study based on her attorney's advice.

Dr. Howard, Appellant's physician, repeated the substance of her testimony at the permanency planning hearing. She added that although Appellant's hygiene had improved, she had not seen much evidence of her willingness to change her behavior in order to live a more normal life. She stated that she had missed several doctor appointments, including one the day prior to the hearing and an appointment in August. A report subsequently compiled by Dr. Howard reflected her assessment that Appellant's medical condition would make it difficult, but not impossible, for her to care for an eight–year–old child, because she has a "huge problem just caring for herself." The report also contained her opinion that Appellant's poor judgment and mental capabilities would make it difficult for her to care for the child.

Brenda Keith, an adoption specialist for DHS's Division of Child and Family Services, testified that she believed P.J. was adoptable, due to her age and health, and that families can be recruited for this child. She also indicated that adoption subsidies are available because the child has special needs due to her diagnosis of ADHD and disruptive behavior disorder. Even with these problems, Ms. Keith reiterated that the child is adoptable.

Vickie Lawrence, a therapist with Arkansas Behavioral Health Care, testified that she had been conducting family therapy with Appellant and P.J., but that she had ceased being Appellant's therapist on July 25, 2003, due to her anger over not being allowed access to her daughter's files because the child was not in her custody. She indicated that Appellant was initially cooperative, but that over time she would vacillate as to how she approached therapy. She stated that she was primarily working on parenting skills for Appellant and was also attempting to get her to assess her own medical situation and whether she could meet the child's needs. She believed that Appellant did not have a realistic assessment of her capabilities to meet the child's needs for school necessities and a structured home environment essential for a child of P.J.'s age. She opined that Appellant needed more therapy in order to gain a realistic assessment of herself, including her anger and family issues, a process that could take several years.

Ms. Lawrence testified that she observed Appellant and P.J. interact together, and that they would interact as if they were equals, not parent and child. For her, this raised concerns regarding Appellant's ability to care, teach, and prepare the child. She also voiced her concern that it was not healthy for P.J., because she was being deprived of the ability to be a child. She also observed situations in which P.J. acted as the adult and Appellant acted like the child. She stated that correcting this role reversal would take more than just a few months and both the mother and child would have to actively participate in the process. She stated that progress was dependent on how receptive the parent is to change. She stated that she has seen Appellant make an effort to assume the parental role in the past, but not currently.

On cross-examination, Ms. Lawrence indicated that Appellant's style of problem solving was confrontational and aggressive. She said that Appellant has always been angry at DHS's intervening in her life, and that Appellant constantly made reference to her attorney, saying that she was going to "fight to get her child back," and that they were going to "bring the system down." She stated

that such confrontational legal advice could have added to Appellant's problems, but that Appellant still had serious problems with anger and problem solving.

Ms. Lawrence indicated that given P.J.'s ADHD and her disruptive and oppositional behavior, she did not believe that Appellant could provide a home for the child without assistance, such as from extended family. She stated that P.J. needs a structured home and consistency, where she understands the expectations placed on her, as well as the establishment of limits and boundaries. She stated that P.J.'s behavior indicates that Appellant has not been able to meet those needs.

Wendy Harris, the resident manager of Our Way apartments, testified that Appellant and her son, Andrew, currently lived at the apartments but had an eviction pending due to Appellant's inability to control her son. She testified that she had made Appellant aware of this problem many times, and that she had finally requested a meeting with Appellant and Andrew in June 2003. She stated that she notified Appellant in writing of the scheduled meeting, and that Appellant had called her after receiving the letter. She said that she explained to Appellant that this was the final effort to get to the bottom of Andrew's behavioral issues. For whatever reason, however, Appellant did not attend the meeting.

Loretta Siggers testified that she had been one of P.J.'s therapeutic foster care parents. She described P.J. as a hyper child who likes to be in control and play an adult role. She stated that P.J. calmed down some after she told her that she could be a child and did not have to be the adult and that she would take care of her. She stated that P.J. responded well to structure. She testified that P.J. visited with her mother on alternate Fridays and would either be hyped up or would not want to attend. When she did visit with Appellant, Ms. Siggers noticed that the child would be happy and excited to see her mother.

Ethel Woodson, P.J.'s current therapeutic foster care mother, testified that P.J. is a good person, smart, strong-willed, but up and down all the time. She stated that P.J. has had visits with her mom while in Ms. Woodson's care, but that the child has cried and refused to go the past two times, with no explanation given. She stated that after the child had returned from the last visit with Appellant, she reported that her brother had taken her lunch money away from her. Ms. Woodson noted that P.J. was doing well in school.

Charles Thigpen, who had initially been P.J.'s therapist, testified that P.J. is a very energetic, opinionated child with her own way of thinking and a need to be in control. He stated that she is often oppositional with authority figures and rules, but despite this is fairly easily redirected by multiple cuing. She is easily distracted and does not always pay attention, but is a bright child. He stated that she was doing well in her current home, but she still has the problems outlined above. He opined that it would not be in P.J.'s best interests to return her to her mother. He explained that the child is safe in their care, and that her needs are being met and will continue to be. He stated that there is no risk that she will operate in any manner except as a child while she remains with them, but he cautioned that he did not know what would happen if she was returned to her mother's home.

Ms. Carter, the family services worker, testified that since the last hearing, Appellant had not remedied her situation, despite the fact that DHS had provided many services to her, such as intensive family services, transportation, casework services, lay therapy, in-home parenting, general referrals, and home study requests. She also stated that DHS had helped her apply for food from food pantries and had provided other food services. She testified that she had attempted to assist Appellant with a housing voucher, but that she would not take an application because it required her to submit an out-of-state birth certificate, which would cost fifteen dollars. Ms. Carter noted, though, that Appellant had chosen to have cable television in her home.

Ms. Carter also stated that every time she has gone to Appellant's home, she is in a chair where she sleeps. She said that she had never seen Appellant exercise. However, she said that she had offered to help her walk and had questioned her about exercise, but that Appellant was adamant that she could not walk even short distances. She also testified that when Appellant and P.J. would eat lunch during their visitation, Appellant usually ate two to three tuna or bologna sandwiches, chips, and soda. On one occasion, a worker brought a ham sandwich for P.J., but Appellant took it for herself and gave the child a bologna sandwich.

Ms. Carter recommended that Appellant's parental rights be terminated, because P.J. had been in foster care for almost two years and needed permanency. She stated that P.J. needed a safe home with emotional, physical, and mental stability, and with structure, where the child was being cared for by an adult, not the

other way around. She indicated that even though Appellant had completed parenting classes, her general noncompliance with previous case plans and court orders contributed to Ms. Carter's recommendation of termination.

The last witness to testify was Appellant. She stated that she was in the process of moving into a two-bedroom apartment at Eastview Apartments. She said that her son was only there to help her move and would then be returning to his home in Texarkana. She stated that she had missed her recent appointment with Dr. Howard because she was packing for the move. She admitted that she still had a confrontational attitude with some people, due to her thinking that she deserves some privacy in her life and should not have people barging in and knowing about her life. She stated that this concept was reinforced by her former attorney, but her new attorney has told her she would have to give up some privacy for now. When asked about a home study being done, she indicated that she was not thrilled about having it done, but that she would let them in the home now and would complete the paperwork. Regarding therapy with Ms. Lawrence, she said that she had formerly been advised not to cooperate or provide information, but, in any event, she did not trust Ms. Lawrence. She indicated that she has since been advised to approach therapy openly and to express her feelings appropriately and in a calm fashion. She testified that she has seen today how a confrontational attitude would not help her.

She testified further that since August 2003, her eating has totally changed and she eats more vegetables and boiled chicken; however, she admitted that she had eaten fast food on the day of the hearing. She also stated that she walks with her son and does some weight-lifting with milk jugs. She stated that she had seen her endocrinologist within the last week and that she had lost forty pounds in one month's time, due mainly to her change in diet. With regard to structure and counseling, she indicated that she heard that change would take a long time, but already felt that she had excellent structure. She indicated a willingness to go to counseling, but not with Ms. Lawrence. She stated that her own attitude depends on the attitude of others and that she will be cooperative, "[b]ut if they come with an attitude toward me, then I'm going to meet them with an attitude." She stated that she was upset with DHS because they had been in her life for twenty years, from the time that her rights over her son Andrew were termi-

nated. She testified that no one at DHS or any related agency had tried to help her, and she denied that she had done anything wrong.

At the conclusion of the termination hearing, the trial court indicated that it would take the matter under advisement until it could review all of the evidence presented. Thereafter, on January 7, 2004, the trial court issued its order terminating Appellant's parental rights. The trial court's order provides in pertinent part:

> Regarding [P.J], the Court finds that despite the offer of appropriate and meaningful services, Ms. [Jones] has not taken advantage of these services and rehabilitated her life and health. Based on Ms. Jones' current medical condition, it does not appear that she can provide a stable home within the foreseeable future for the eight (8) year-old. Her Primary Care Physician reports that as of December 18, 2003, her condition is such that it would be difficult but not impossible for Ms. Jones to care for [P.J.] However, factoring in her poor judgment and psychological issues, the eight (8) year-old would be caring for her mother as opposed to the mother caring for her. The mother had her parental rights terminated on her older son, and despite that fact, the Court has continued a goal of reunification for an extended period of time with the hope that Ms. Jones could get her life and health status under control. This has not happened. Ms. Jones continues to exhibit the unhealthy behaviors that exacerbate her health problems, as well as being reticent to follow recommendations regarding anger management and other behavioral issues. Ms. Jones has blamed her former attorney for her uncooperativeness in the past. Although her demeanor has slightly improved recently, she still has not taken personal responsibility for her confrontational and contentious attitude towards this case. The juvenile is in need of permanency that her mother simply cannot provide. Ms. Jones has had several hospitalizations, including one since the termination of parental rights has been taken under advisement. No plan for the care for the child has been presented to the Court for occasions like this. The Court reluctantly comes to the conclusion that Ms. Jones would not, even if given more time, present a stable home and evidence sufficient parenting skills to regain custody within a reasonable period of time. Thus, the Court finds by clear and convincing evidence that it is in the child's best interests and necessary to her well-being to terminate Ms. Jones's parental rights and hereby does so.

It is from this order that Appellant appeals.

## Sufficiency of Evidence for Termination

■ Appellant's first point on appeal is that there was insufficient evidence to support the trial court's decision to terminate her parental rights. In cases involving the termination of parental rights, there is a heavy burden placed upon the party seeking to terminate the relationship. *Camarillo-Cox v. Arkansas Dep't of Human Servs.*, 360 Ark. 340, 201 S.W.3d 391 (2005); *Trout v. Arkansas Dep't of Human Servs.*, 359 Ark. 283, 197 S.W.3d 486 (2004). This is because termination of parental rights is an extreme remedy in derogation of the natural rights of the parents. *Id.* Nevertheless, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Id.* Thus, parental rights must give way to the best interest of the child when the natural parents seriously fail to provide reasonable care for their minor children. *Id.*

■ Arkansas Code Annotated § 9-27-341(b)(3) (Repl. 2002) requires that an order terminating parental rights be based upon clear and convincing evidence. *See also id; Dinkins v. Arkansas Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001). Clear and convincing evidence is that degree of proof that will produce in the factfinder a firm conviction as to the allegation sought to be established. *Id.* It is well settled that when the burden of proving a disputed fact is by clear and convincing evidence, the question that must be answered on appeal is whether the trial court's finding that the disputed fact was proven by clear and convincing evidence was clearly erroneous. *Id.* In making this determination, we review the case *de novo*, but we give a high degree of deference to the trial court, as it is in a far superior position to observe the parties before it and judge the credibility of the witnesses. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* With this standard in mind, we turn to the particulars of this case.

Appellant argues that DHS initially took custody of P.J. due to Appellant's hospitalization for a heart attack, and that, accordingly, the child should have been returned to her once she had recuperated. She argues that DHS did not allege as reasons for removing the child Appellant's poor hygiene, lack of progress in her health care, unstable home, combative behavior, and psycho-

logical problems. Yet she asserts that these were the reasons that the trial court cited as supporting termination.

Appellant's argument misses the mark. It is of no consequence that P.J. was initially removed due to Appellant's emergency medical condition. One of the statutory grounds for termination of parental rights is that other factors arose *subsequent to the filing of the original petition for dependency-neglect* that demonstrate that return of the juvenile to the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent return of the juvenile to the custody of the parent. *See* Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(a) (Repl. 2002). DHS listed this ground in its petition for termination. Thus, the trial court was correct to consider events and conditions that occurred after P.J. had been removed from the home, such as Appellant's health and lack of mobility, her lack of food and a stable place to live, her combative behavior, and her failure to follow her doctor's recommendations and the court's orders.

Appellant also argues that there was never any evidence presented regarding her mental state and that it was therefore error for the trial court to consider "her poor judgment and psychological issues." However, Appellant acknowledges her own testimony that she was seeing a doctor for depression and that he had prescribed two medications for her, Paxil and Valium. Moreover, this argument ignores the vast evidence showing that Appellant had repeatedly exercised poor judgment, especially with regard to her own health. She refused to see the dietician that Dr. Howard had recommended; she repeatedly missed her appointments with her various doctors, including her cardiologist; she could not budget her money, such that she routinely ran out of food in the middle of the month, but she maintained cable TV; she allowed her grown son back into her home, even though she had indicated to others that she was fearful of him and that he had stolen money from her; she did not get rid of her cat, as advised by Dr. Howard, even though it had scratched her, causing an infection for which she was hospitalized; she did not show up to a meeting with her apartment manger to discuss the complaints about her son, even though she knew that her eviction would

likely result; and finally and perhaps most significantly, Appellant refused to follow her doctor's recommendations regarding her need to lose weight and manage her diabetes, high blood pressure, and heart disease.

■ Appellant also argues that the trial court erred in finding that she had willfully failed to provide significant material support or to maintain meaningful contact with P.J., under section 9-27-341(b)(3)(B)(ii)(a). She asserts that the evidence showed that she had consistent, regular visitation with her daughter. She asserts further that she was under no court order to provide financial support for her daughter and that the court itself recognized that she was not financially able to provide such support, as she was found to be indigent. The problem with this argument is that the trial court did not make the finding that Appellant claims. Although the order of termination reflects the trial court's citation to the foregoing statutory provision, there is nothing in the order showing that the decision to terminate was based on this provision. Accordingly, there is no issue to review on this point.

■ Finally, Appellant argues that the trial court erred in failing to recognize the progress that she had made since she was appointed new counsel, namely that she had lost forty pounds and was cooperating with DHS's requests and with the court's orders. She contends that her prior counsel gave her bad advice in telling her not to comply with the court's orders, especially that regarding the home study of her apartment. She argues that in light of the fact that she had been appointed new, less combative counsel, and in light of the testimony of the adoption specialist, to the effect that she doubted if an additional three to six months would make any difference in securing an adoptive home for P.J., the trial court should have granted her request for more time. We cannot say that the trial court's denial of additional time for Appellant to comply, given her past performance, was clearly erroneous.

■ Consistent with this court's observation in *Trout*, 359 Ark. 283, 197 S.W.3d 486, to agree with Appellant's claim that the court should have given her more time to comply with its orders ignores the fact that she had consistently failed to comply with the court's orders for more than two years. It would also require us to ignore the fact that regardless of whether her first attorney told her to refuse to cooperate with the court's orders regarding the home

study, Appellant herself was aware of this requirement, as the trial court spoke directly to her about the need for the home study. Moreover, this court has repeatedly held that evidence that a parent begins to make improvement as termination becomes more imminent will not outweigh other evidence demonstrating a failure to comply and to remedy the situation that caused the children to be removed in the first place or, as in this case, that caused the child to continue to remain outside of the parental home after the initial removal. *See, e.g., Camarillo-Cox*, 360 Ark. 340, 201 S.W.3d 391; *Trout*, 359 Ark. 283, 197 S.W.3d 486; *Jefferson v. Arkansas Dep't of Human Servs.*, 356 Ark. 647, 158 S.W.3d 129 (2004).

■ Based on the foregoing evidence, even considering Appellant's eleventh-hour attempt to remedy the situation, we conclude that there is clear and convincing evidence to support the trial court's decision to terminate Appellant's parental rights. In ruling as we do, we are mindful that the stated purpose of the termination process is to provide permanency for the child when it appears from the evidence that a return to the family home cannot be accomplished in a reasonable period of time. *See* section 9-27-341(a)(3). When these proceedings began, P.J. was six years old. When termination was granted, she was nearly nine. She is now ten. We agree with the trial court that Appellant was given ample time to correct her situation and that it is in P.J.'s best interests to be placed for adoption.

■ On a somewhat related point, Appellant claims that she was never included in the case plan preparation and never allowed the opportunity to participate in any of the DHS staffings that involve case plan development, and that she never signed a case plan prepared by DHS. She asserts that this is contrary to the law set forth in Ark. Code Ann. § 9-27-402(a)(1)(A) (Repl. 2002). However, that is as far as her argument goes; she does not develop any legal argument as to why this entitles her to relief on appeal and she does not allege how she was prejudiced, assuming *arguendo* that her claims are true. We will not consider on appeal assignments of error unsupported by convincing argument or authority, unless it is apparent without further research that the point is well taken. *Rodriguez v. Arkansas Dep't of Human Servs.*, 360 Ark. 180, 200 S.W.3d 431 (2004).

### Constitutional Arguments

Appellant's second and third points on appeal comprise constitutional challenges ·under the Sixth and Fourteenth Amendments to the United States Constitution. For her second point, Appellant argues that by terminating her parental rights, the trial court violated her due-process rights and her fundamental right to bear and raise children under the Fourteenth Amendment. We cannot reach the merits of this claim, as it was never raised or ruled upon below. This court has made it abundantly clear that it will not consider an argument, even a constitutional one, raised for the first time on appeal. *See, e.g, Smith v. Sidney Moncrief Pontiac, Buick, GMC Co.*, 353 Ark. 701, 120 S.W.3d 525 (2003); *Utley v. City of Dover*, 352 Ark. 212, 101 S.W.3d 191 (2003); *Ivy v. Keith*, 351 Ark. 269, 92 S.W.3d 671 (2002).

For her third point, Appellant argues that she was denied the right to effective assistance of counsel under the Sixth Amendment to the United States Constitution and that she was irrevocably prejudiced by the ineffective assistance of her first appointed counsel. The crux of this argument is Appellant's claim that she was given bad legal advice by her first attorney, Mr. Vandagriff, to the effect that she should ignore court orders and refuse to cooperate with DHS. She asserts that once her first attorney withdrew and she was appointed new counsel, she began to make progress toward the goal of reunification with her daughter.

The right to counsel in termination cases in Arkansas arises not from the Constitution, but from statutory law. *See Bearden v. Arkansas Dep't of Human Servs.*, 344 Ark. 317, 42 S.W.3d 397 (2001). Arkansas Code Annotated § 9-27-316(h) (Repl. 2002) provides in pertinent part:

> (1) In all proceedings to remove custody from a parent or guardian or to terminate parental rights, the parent or guardian shall be advised, in the dependency-neglect petition or the ex parte emergency order and the first appearance before the court, of the right to be represented by counsel at all stages of the proceedings and the right to appointed counsel if indigent.

> (2) Upon request by a parent or guardian and a determination by the court of indigence, the court shall appoint counsel for the parent or guardian in all proceedings to remove custody or terminate parental rights of a juvenile.

Appellant asserts that the foregoing right to counsel afforded to parents in termination cases necessarily includes the right to effective counsel. Although this is an issue of first impression in this state, we take note of decisions from other jurisdictions that have recognized the right to effective assistance of counsel in cases involving the termination of parental rights.

For example, the Supreme Court of Wisconsin has held: "It is axiomatic that the right to be represented by appointed counsel is worthless unless that right includes the right to *effective* counsel. Representation by counsel means more than just having a warm body with 'J.D.' credentials sitting next to you during the proceedings." *In re M.D.(S).*, 168 Wis. 2d 995, 1003, 485 N.W.2d 52, 54 (1992) (footnote omitted). In so holding, the Wisconsin court reiterated that a parent's right to the custody and care of his or her children is an extremely important interest demanding protection and fairness.

Similarly, the Supreme Court of Texas has held that "[i]t would seem a useless gesture on the one hand to recognize the importance of counsel in termination proceedings, as evidenced by the statutory right to appointed counsel, and, on the other hand, not require that counsel perform effectively. *In the Interest of M.S.*, 115 S.W.3d 534, 544 (2003) (quoting *In re K.L.*, 91 S.W.3d 1, 13 (Tex. Ct. App. 2002)). *See also In re D.W.*, 385 N.W.2d 570 (Iowa 1986); *In re Heston*, 129 Ohio App. 3d 825, 719 N.E.2d 93 (1998) (*per curiam*); *In re E.H.*, 880 P.2d 11 (Utah Ct. App. 1994).

■ In each of the foregoing states, the right to counsel for parents in termination proceedings was guaranteed by statute, just as it is in this state. Also, in each of the foregoing states, the standard adopted for determining whether counsel performed ineffectively was that set out by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), for claims of ineffectiveness in criminal cases. The *Strickland* test is two-pronged, requiring the defendant to prove, first, that counsel's performance was deficient and, second, that counsel's deficient performance prejudiced the defendant to the extent of depriving him or her of a fair trial. *See Johnson v. State*, 356 Ark. 534, 157 S.W.3d 151, *cert. denied*, 543 U.S. 932 (2004); *Jackson v. State*, 352 Ark. 359, 105 S.W.3d 352 (2003). The rationale of adopting this criminal-case standard was well stated by the Ohio Court of Appeals: "Where the proceeding contemplates the loss of parents' 'essential' and 'basic' civil rights to raise their children, the test for

ineffective assistance of counsel used in criminal cases is equally applicable to actions seeking to force the permanent, involuntary termination of parental custody." *In re Heston*, 129 Ohio App. 3d at 827, 719 N.E.2d at 95 (quoting *In re Murray*, 52 Ohio St. 3d 155, 157, 556 N.E.2d 1169, 1171 (1990)) (citing *Stanley v. Illinois*, 405 U.S. 645 (1972); *Meyer v. Nebraska*, 262 U.S. 390 (1923) (other citations omitted)).

■ Like the foregoing jurisdictions, this court has recognized that a parent's right to the care and control of his or her child is a fundamental liberty and that termination of parental rights is an extreme remedy in derogation of the natural rights of the parents. *See Camarillo-Cox*, 360 Ark. 340, 201 S.W.3d 391; *Trout*, 359 Ark. 283, 197 S.W.3d 486; *Linder v. Linder*, 348 Ark. 322, 72 S.W.3d 841 (2002); *Arkansas Dep't of Human Servs. v. Huff*, 347 Ark. 553, 65 S.W.3d 880 (2002). The legislature of this state has also recognized the fundamental nature of a parent's right over a child, as the procedure established for termination of that right expressly includes the right to counsel at every stage of the proceedings. *See* section 9-27-316(h). We thus do not hesitate to conclude that the legislature intended the right to counsel for parents in termination proceedings to include the right to effective counsel.

■ We also conclude that the deprivation of parental rights is in many ways similar to the deprivation of liberty at stake in criminal cases, as this court has previously compared termination proceedings with criminal proceedings in circumstances involving the right to counsel. *See Linker-Flores v. Arkansas Dep't of Human Servs.*, 359 Ark. 131, 190 S.W.3d 739 (2004) (holding that counsel representing a parent in a termination proceeding is required to file a no-merit brief comparable to that required under *Anders v. California*, 386 U.S. 738 (1967) where there appears to be no meritorious grounds for appeal); *Baker v. Arkansas Dep't of Human Servs.*, 340 Ark. 42, 8 S.W.3d 499 (2000) (holding that although termination cases are civil in nature, the principles that require payment of attorney's fees for representing an indigent criminal defendant, are applicable to termination cases as well). Because of the similarities in termination proceedings and criminal cases, we adopt the standard for ineffectiveness set out in *Strickland*.

■ Notwithstanding our holding today that, as a matter of law, the right to counsel in termination cases includes the right

to effective counsel, we must decline to issue any ruling as to whether Appellant's counsel was ineffective in this case. The record does not reflect that this argument was raised below or that the trial court.ever made any ruling on the matter. It is well settled that this court will not consider a claim of ineffective assistance of counsel as a point on appeal unless the issue was first raised in the trial court and the facts and circumstances surrounding the claim were fully developed in the trial court. *See Ratchford v. State*, 357 Ark. 27, 159 S.W.3d 304 (2004); *McClina v. State*, 354 Ark. 384, 123 S.W.3d 883 (2003); *Chavis v. State*, 328 Ark. 251, 942 S.W.2d 853 (1997).

Here, although Appellant testified that she had initially refused to cooperate with DHS on the advice of her first attorney, Mr. Vandagriff, she never specifically raised the issue of his ineffectiveness. Her second attorney, Ms. Blackmon-Solis, in her request for more time to allow Appellant to comply with the court's directives, spoke of Mr. Vandagriff's having a different method of practice, which was to fight the system because he believed the system was wrong in this case. However, Ms. Blackmon-Solis conceded that she was "not saying that her other attorney was ineffective or did anything wrong," only that his approach to this case was "very different from the way I practice law." Moreover, there was no attempt to present evidence from Mr. Vandagriff, himself, as to the advice he did or did not give Appellant. In short, Appellant failed to raise the issue of Mr. Vandagriff's ineffectiveness and failed to fully develop the facts and circumstances surrounding her claim. Accordingly, we will not reach the merits of this point on appeal.

Affirmed.