

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CV-15-1069

|  |  |
|---|---|
| CHRISTINE HERNANDEZ<br>APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN<br>APPELLEES | **Opinion Delivered** May 4, 2016<br><br>APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT<br>[NO. J14-463-3]<br><br>HONORABLE STACEY ZIMMERMAN, JUDGE<br><br>AFFIRMED |

### LARRY D. VAUGHT, Judge

Appellant Christine Hernandez appeals the October 2015 order of the Washington County Circuit Court terminating her parental rights to her children S.B.1 (DOB 2-15-09) and S.B.2 (DOB 5-15-11).[1] On appeal, Christine argues that there is insufficient evidence to support the trial court's decision to terminate her parental rights. We affirm.

The Arkansas Department of Human Services (DHS) filed a petition for dependency-neglect on July 11, 2014, alleging that S.B.1 and S.B.2 were at a substantial risk of serious harm as the result of abuse, neglect, and parental unfitness. An affidavit of Antwain Harris that accompanied the petition stated that DHS had opened a protective-services case on the family in January 2014 after it was discovered that S.B.1 had cuts, bruises, and welts on her body. Harris stated that Christine and her husband, Kevin Hernandez (the children's stepfather), had

---

[1] The order also terminated the parental rights of Valentine Navarro-Martavo, the putative father of S.B.1, and Jesus Chavez, the biological father of S.B.2; however, they are not parties to this appeal.

agreed to a protection plan, which included not allowing other adults to live in their home and not leaving the children with inappropriate caregivers. However, according to Harris, since the protective plan had been implemented, four other adults had been living in the home, and two of them slept in the same room as S.B.1 and S.B.2; the children were not being fed, bathed, or clothed; neighbors were feeding the children; Christine did not pick up S.B.1 from school when she was very sick; Christine did not take S.B.1 to school when she was well; the children were kept locked in their room for extended periods; Kevin punished the children "as if they were teenagers"—"hit[ting] the children in their hands extremely hard and ground[ing] them"; Christine allowed a mentally disabled child to watch S.B.1 and S.B.2; and there were allegations that S.B.1 had been sexually abused.

On July 24, 2014, DHS filed a petition for emergency custody and dependency-neglect. In a second affidavit of Harris, he added that Christine was in violation of the protective plan because inappropriate adults were still living in the Hernandez home and were the sole child-care providers for the children. The trial court entered an ex parte order for emergency custody that day.

An adjudication order was entered in September 2014. The parties stipulated that the children were dependent-neglected. The concurrent goals were reunification of the family and adoption. Services were offered to Christine. She was ordered to visit the children; contact her caseworker weekly; have a psychological evaluation; participate in individual counseling; not use illegal drugs; submit to a drug-and-alcohol assessment; complete parenting classes; obtain and maintain clean, safe, and stable housing; and demonstrate the ability to protect the children and keep them safe from harm.

SLIP OPINION

In an amended review-hearing order filed in January 2015, the trial court found that the children remained in need of services and that returning them to Christine was not in their best interest. Christine was noted to be compliant with most of the case plan but had not demonstrated the ability to protect the children.

After a permanency-planning hearing conducted in May 2015, Christine was deemed to be compliant with the case plan and the trial court's orders; however, the court found that she had not addressed the issue that caused removal and that no substantial measurable progress had been made. The goal was set as adoption, and the trial court authorized DHS to file a petition for termination of parental rights.

DHS filed a petition to terminate parental rights, and at the September 2015 termination hearing Christine's counselor testified that Christine admitted she had made a mistake in allowing unsafe people to live with and care for her children. Christine's treatment included working on setting boundaries and learning to protect the children from people with whom she was not familiar. Christine denied allegations that Kevin had abused S.B.1 and S.B.2.

The psychological evaluations of Christine and Kevin were admitted at the hearing. Christine's evaluation revealed that she had a dependent-personality disorder, possibly due to having been sexually abused as a child by her father, her brother, her stepbrother, and her godfather; she had problems with immaturity, denial, and poor judgment; and she "seems to be extremely passive and to tolerate inappropriate friendships and behaviors from others." Kevin's psychological evaluation revealed that he had a personality disorder with narcissistic and antisocial traits; he "seems to be hostile, distrusting, and grandiose"; he demonstrated low

levels of warmth and sympathy; and he "appears to view himself as a protector and to deny or minimize his problems with aggression and recklessness." A case report reflects that Kevin was arrested in September 2014 for aggravated assault after he pointed a gun at a man in a parking lot.

The children's therapist, Melissa Bedford, testified that Kevin admitted spanking the children and stated that he used fear to parent them. She testified that the fear-based parenting method was inappropriate because of the children's posttraumatic-stress disorder.[2] She also said that Kevin resisted her efforts to teach him alternative parenting methods. The therapist stated that S.B.1 feared Kevin and that she looked fearful once when Christine and Kevin picked her up for a visit.

Andrea Emerson, DHS family-service worker, testified that during visitation Christine did not interact much with her daughters. She "pushes the kids to go to Kevin and doesn't interact with them. She does tend to just sit there, stare at the wall or look at her phone." During one visit, Christine cut S.B.2's bangs at the hairline. Emerson testified that she did not believe that Christine had remedied the conditions that caused the removal of the children despite the services provided. Emerson further stated that S.B.1 and S.B.2 were doing well in foster care, that the foster parent expressed an interest in adopting them, and that they were adoptable.

The children's foster mother, "Diana," testified that the children's behavioral problems had improved and that they are doing very well. However, according to Diana, after visits with

---

[2] Bedford's reports reflect that S.B.1's and S.B.2's primary diagnosis was posttraumatic stress and that their secondary diagnosis was sexual and physical abuse.

Christine and Kevin, S.B.1 was afraid; she would not go to the bathroom alone, and she wanted the door to her bedroom open and the light left on at night. Diana also testified that after one visit, S.B.2 was found hiding under a DHS desk, extremely upset, refusing to come out, and demanding to go home with Christine. Diana stated that S.B.2 cried the entire ride home. Diana later learned from S.B.2 that Christine had pulled S.B.2's tooth and told her that the tooth fairy would not be able to find her at Diana's house.

Christine testified that she would not allow others who were not safe to live with or care for her children. However, she also admitted that she told a DHS worker that her day-care plan, if the children were returned to her, was to have friends of hers, whose last names she did not know, babysit. Christine also told a DHS worker that another friend (with an unknown last name), was going to be moving in with her and Kevin. Christine added that her children were not afraid of Kevin and that he was not mean to them.

Kevin denied telling Bedford that he used fear to parent the children. He admitted spanking S.B.1 once. He denied allegations that the children were not fed or that they feared him. He admitted that he and Christine made a mistake when they allowed a "bad news character" to live with them, but he testified that would never happen again.

The trial court took the matter under advisement and entered a termination order on October 15, 2015. This appeal followed.

The standard of review in appeals of termination of parental rights is de novo, but we reverse a trial court's decision to terminate parental rights only when it is clearly erroneous. *Wade v. Ark. Dep't of Human Servs.*, 337 Ark. 353, 357, 990 S.W.2d 509, 512 (1999). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the

SLIP OPINION

entire evidence is left with a distinct and firm conviction that a mistake was made. *Id.*, 990 S.W.2d at 512. Credibility determinations are left to the fact-finder, here, the trial court. *Schaible v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 541, at 8, 444 S.W.3d 366, 371.

In termination cases, at least one statutory ground must exist, in addition to a finding that it is in the child's best interest to terminate parental rights; these must be proven by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3) (Repl. 2015). In this case, the trial court found that two statutory grounds alleged by DHS had been proven to support terminating Christine's parental rights; however, only one ground must be proved to support termination. *Hunter v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 95, at 7. The first ground was the failure-to-remedy ground set forth in Arkansas Code Annotated section 9-27-341(b)(3)(B)(i)(*a*). The trial court found that S.B.1 and S.B.2 had been out of Christine's home more than twelve months, that they had been adjudicated dependent-neglected, and that despite the services provided by DHS, Christine had not remedied the conditions that caused removal of the children in that she had not demonstrated an ability to protect the children, keep them from harm, and meet their needs.

Christine argues that the evidence was insufficient to prove that she failed to remedy the cause of the removal. She states that her children were removed from her custody because she permitted inappropriate caregivers to live in her home and care for her children. She contends that she remedied this condition by ordering those caregivers to leave her home. She adds that no other adults have stayed in her home. She argues that her parenting skills have improved and that she understands how to protect her children from inappropriate or unsafe people.

SLIP OPINION

In this case, the children were removed from Christine's custody because she was found to be an unfit parent, which included allegations and/or evidence of physical and sexual abuse; failing to feed, bathe, and dress the children; failing to pick them up from school when they were sick; failing to take them to school when they were well; locking them in their room for extended periods; punishing them like teenagers by striking them and grounding them; and permitting unfamiliar adults and minors to live in her home and care for them. At the conclusion of this case, the trial court found that while Christine partially complied with the case plan and court orders, she remained an unfit parent:

> Although [Christine] . . . [has] attended visits, cooperated with DHS, taken parent classes and counseling, this Court finds by CLEAR AND CONVINCING EVIDENCE that [she has] NOT demonstrated an ability to protect these children and keep them safe from harm and [has] NOT demonstrated that [she] can meet these children's needs. Based upon the testimony, exhibits and demeanor of the witnesses, this Court has NO DOUBT that if these children were returned to mother . . . that the girls would be exposed to more abuse, either physical, sexual or emotional.

Under our de novo review, we hold that the trial court did not clearly err in finding that Christine remained an unfit parent and therefore failed to remedy the conditions that caused removal. In finding that she did not have the ability to care for and protect her children, the trial court relied on her psychological evaluation that concluded that she had problems with immaturity, denial, and poor judgment; was extremely passive; and tolerated inappropriate friendships and behaviors from others. This was demonstrated in several instances.

First, despite having knowledge of Kevin's fear-based parenting style and her children's negative responses to it, she remained married to him and denied that he caused harm to the children. Second, despite the prohibition against having other adults living with and caring for

7

her children, Christine's day-care plan was to have two friends of hers, whose last names she did not know, babysit her children, and she planned to have another friend, whose last name she did not know, move in with her. Finally, Christine exercised poor judgment during visits with the children. She cut S.B.2's bangs to her scalp, and she pulled S.B.2's tooth and told her that the tooth fairy would not be able to find her at her foster parents' home. Both incidents caused S.B.2 to become extremely upset.

At the conclusion of the termination hearing the trial court stated, "In [ninety-nine] percent of my cases, I rule from the bench," but "I am not gonna do a knee-jerk reaction type of ruling." The court acknowledged that there were numerous exhibits and that it had taken notes of all of the witnesses' testimony and then took the matter under advisement. In its termination order, the court stated that it considered the testimony, exhibits, and demeanor of the witnesses, and based on that evidence, it determined that Christine failed to remedy the conditions and remained an unfit parent. In the trial court's extensive consideration of the evidence, it did not believe Christine and Kevin when they testified that they would not permit unfamiliar people to live with them and care for the children. The court did not believe Kevin when he testified he did not use fear to parent S.B.1 and S.B.2. The court did not believe Christine when she said that the children were not afraid of Kevin or that he did not abuse them. Appellate courts, in matters that involve young children's welfare, will give great weight to the trial court's personal observations. *Johnson v. Ark. Dep't Human Servs.*, 78 Ark. App. 112, 119, 82 S.W.3d 183, 187 (2002). We must give due regard to the opportunity of the trial court to judge the credibility of witnesses. *Osbourne v. Ark. Dep't Human Servs.*, 98 Ark. App. 129, 133,

252 S.W.3d 38, 142 (2007). Accordingly, we hold that the trial court did not clearly err in finding that Christine failed to remedy the conditions that caused removal.

Also under the failure-to-remedy ground, Christine argues that the trial court clearly erred in finding that DHS provided meaningful efforts to correct the issues that caused removal. She concedes that DHS provided numerous services but contends that DHS should have provided family counseling.

The record demonstrates that DHS provided individual counseling, psychological evaluations, and drug testing for Christine and Kevin; parenting classes and a drug-and-alcohol assessment for Christine; DNA testing; supervised visitation; home visits; occupational, physical, speech, and developmental therapy for the children; counseling for the children; foster care; and family counseling from January to July 2014. In light of this list of extensive services provided by DHS, we hold that the trial court did not clearly err in finding that DHS made meaningful efforts to rehabilitate Christine and to correct the conditions that caused removal of her children.[3]

In addition to at least one ground supporting termination, Arkansas Code Annotated section 9-27-341(b)(3)(A)(i)–(ii) requires a finding by clear and convincing evidence that termination is in the best interest of the juveniles, including consideration of the likelihood that they will be adopted and the potential harm caused by returning custody of them to the parent. The trial court is not required to find that actual harm would result or to affirmatively

---

[3] Because only one ground must be proved to support termination, we do not address Christine's challenge to the sufficiency of the evidence supporting the subsequent-factors ground.

identify a potential harm. *Vail v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 150, at 6. The potential-harm inquiry must be viewed in a forward looking manner and in broad terms. *Hamman v. Ark. Dep't Human Servs.*, 2014 Ark. App. 295, at 11, 435 S.W.3d 495, 502. Our appellate review is limited to whether the trial court's best-interest finding was clearly erroneous. *Vail*, 2016 Ark. App. 150, at 6.

Christine argues that the trial court clearly erred in finding that terminating her parental rights was in her children's best interest. She argues that there was insufficient evidence of potential harm because the evidence demonstrated that she complied with the case plan, she was bonded with the children and they were bonded to her, and she posed no danger to them.[4] According to Christine, the trial court's best-interest finding was based on speculation and conjecture.

We hold that the trial court did not clearly err in finding that it was in the best interest of S.B.1 and S.B.2 to terminate Christine's parental rights. We first note that S.B.1 and S.B.2 have progressed significantly while in foster care. And while Christine was mostly case-plan compliant, her completion of the case plan is not determinative. Whether her completion achieved the intended result of making her capable of caring for S.B.1 and S.B.2 is what mattered. *Vail*, 2016 Ark. App. 150, at 6. DHS had been offering services to Christine since January 2014, yet evidence demonstrated that she remained unfit to parent her daughters. Christine was willing to allow Kevin to parent S.B.1 and S.B.2, who had both been diagnosed with posttraumatic-stress disorder, by use of fear. Bedford testified that such parenting was inappropriate for children suffering from posttraumatic stress because it raised their anxiety.

---

[4] Christine does not challenge the trial court's finding that the children were adoptable.

There was evidence that S.B.1 feared Kevin and that her fear was manifested in her behavior. The children suffered from anxiety following his visits. Two months after the children had been taken into DHS custody, Kevin was arrested for aggravated assault. And finally, Christine did not learn or understand the significance of having people unfamiliar to her living in her home and caring for her children as she reported to DHS that she planned to do both.

A parent's past behavior is often a good indicator of future behavior. *Ford v. Ark. Dep't Human Servs.*, 2014 Ark. App. 226, at 2, 434 S.W.3d 378, 381. And as stated above, the trial court did not believe Christine when she testified that she would not allow inappropriate people to live with and care for the children. The court did not believe Christine or Kevin when they testified that he did not use fear to parent the kids and that the kids were not afraid of him. The court simply did not believe Christine when she testified that she would protect her children. Christine's personality disorders support the trial court's conclusion that she would not. We must give due regard to the opportunity of the trial court to judge the credibility of witnesses. *Osbourne*, 98 Ark. App. at 133, 252 S.W.3d at 141.

For all these reasons, we hold that the trial court did not clearly err in finding it was in the best interest of S.B.1 and S.B.2 to terminate Christine's parental rights. Therefore, we affirm.

Affirmed.

GLADWIN, C.J., and HIXSON, J., agree.

*Tina Bowers Lee*, Arkansas Public Defender Commission, for appellant.

*Jerald A. Sharum*, County Legal Operations, for appellee.

*Chrestman Group, PLLC*, by:  *Keith L. Chrestman*, attorney ad litem for minor children.

11