BART F. VIRDEN, Judge
Appellants James Allen and Aleisha Bankston bring separate appeals from the Sebastian County Circuit Court's termination of their parental rights to their son, H.A. (DOB: 3-4-2013). They argue that there was insufficient evidence to establish grounds and that the trial court erred in determining that termination of their parental rights was in H.A.'s best interest. We affirm.
I. Procedural History
On June 17, 2015, the Arkansas Department of Human Services (DHS) filed a *745 petition for emergency custody and dependency-neglect concerning H.A. Attached to the petition was the affidavit of Brooke Harrell, an investigator with DHS, in which she attested that on June 14 the Fort Smith Police Department had been called for a welfare check on the parents' home and had requested DHS's assistance. Harrell was told that there was no electricity in the home, but she saw that there were electrical cords running throughout the home and over to a neighbor's residence. The investigator saw trash and roaches, smelled garbage, and noted that it was "extremely hot" inside the home. The investigator was told that H.A. was not potty trained, that he mostly crawled, and that he could not speak. When asked why she had not enrolled H.A. in developmental classes, Bankston responded that she had not gotten around to it. Allen and Bankston were both arrested for third-degree child endangerment. DHS took a seventy-two-hour hold on H.A. A "CHRIS search" revealed that in 2013 Bankston and then newborn H.A. had tested positive for marijuana. A protective-services case had been opened but was closed approximately one month later after both parents tested negative for all substances.
An ex parte order for emergency custody was entered, and the trial court later found probable cause to issue the order based on the parents' stipulation. On August 24, 2015, H.A. was adjudicated dependent-neglected based on neglect and parental unfitness as to both Allen and Bankston. The trial court ordered DHS to develop a case plan, and the parents were ordered to obtain and maintain stable and appropriate housing, income, and transportation; complete parenting classes; submit to a drug-and-alcohol assessment and follow all recommendations; submit to drug testing; and visit H.A. regularly. Allen was ordered to submit to genetic testing to determine paternity.
A review order was entered on January 4, 2016, in which the trial court found that DHS had complied with the case plan and court orders and that the parents had minimally complied. The trial court found that Allen had produced a certificate of completion for the parenting classes; that the parents' visits with the child were inconsistent; and that the parents had submitted to drug testing, the results of which were positive. Also, the parents had failed to obtain stable housing, employment, and transportation and had failed to submit to a drug-and-alcohol assessment. The trial court found that DHS had made reasonable efforts to provide family services to achieve the goal of reunification.
On October 6, 2016, another review order was entered, and later amended, based on hearings held in May, June, and July 2016. The trial court established a concurrent goal of reunification and adoption following termination of parental rights. The trial court found that DHS had complied with the case plan and court orders and had made reasonable efforts to provide family services. The trial court found that Allen is the biological father of H.A. The trial court found that the parents have housing and had recently signed a lease for a new residence; that the mother draws disability and that the father is employed; that the mother had completed parenting classes; and that both parents had submitted to a drug-and-alcohol assessment. The trial court noted, however, that the parents had not started the recommended treatment following their assessments and that they still had criminal issues pending.
In the fifteen-months review order entered on October 17, 2016, the trial court found that the parents had completed drug treatment but that they had not resolved their criminal issues and did not have driver's licenses.
*746 On November 28, 2016, DHS filed a petition for termination of parental rights. A hearing was held on January 26 and February 24, 2017.
II. Hearing Testimony
Bankston testified that H.A. had a complicated birth in that he had gotten stuck in the birth canal and now has a misshapen head. She said that she had been taking H.A. for therapy but then missed a couple of appointments because of her poor health. She testified that the helmet that H.A. was supposed to wear caused too much pressure on his head and had even caused "blood bruises" around the back of his head. She admitted that she had stopped using the helmet against medical advice. She said that H.A.'s doctor had tried to force the helmet back on H.A.'s head but had eventually given up and instructed her to rotate his head from side to side. She said that she had attended only one doctor's appointment for H.A. but that it was the only one that she had been notified to attend. Allen stated that, although a doctor had instructed them to have H.A. wear a helmet, he and Bankston had deemed it harmful to the child and discontinued using it. He said he understood that the child needed another helmet but that his insurance would not cover it and that they did not have $5,000 to pay for it. Robbie McKay, a DHS caseworker, testified that there was a discussion early on that H.A. needed surgery to reshape his head but that it was later determined that there will be no surgery and that H.A.'s head will be monitored every six months and then every year.
Kayla James, a special-education teacher at Forrester Davis Development Center in Clarksville, testified that H.A. receives physical, occupational, and speech therapy and day habilitation services. She said that, compared to a typical four-year-old child, H.A. was operating as a child of approximately two and a half years. She stated that H.A. will likely continue to need the therapies until he transitions to public school. James described H.A. as a "very, very active" child and said that he has behavioral issues, including aggression, that he needs very close, "if not one-on-one," supervision at all times, and that he has "a very rough time" with change. She said, "[T]here is no rest for a caregiver with this young man." James said that H.A. does not observe nap time at the facility and that he must be given "busy work" or toys so that he does not wake the other children. She testified that, if a parent had a dizzy spell or needed to be in bed, that would be "an issue." James said that the center's disciplinary team had recommended that H.A. be evaluated for autism and ADHD. James said that whoever cared for H.A. outside of class needed to follow the same behavior plan at home. She said that the foster parents had stayed in daily contact with the center. James testified that it was the center's policy not to speak with the biological parents when a child is in foster care.
Linda Butler, a court appointed special advocate (CASA), testified that H.A. is a special-needs child who "did not get the best start in this world." She said that she was concerned that if H.A. is returned to his parents, he will not get the care he needs to meet his full potential. She said that H.A. will have problems most of his life. A CASA court report was entered into evidence. The background information included the following:
[H.A.] was born prematurely at 7 months at Sparks Regional Medical Center then transferred to Mercy NICU unit. [H.A.'s] birth was complicated by the lack of prenatal care and the presence of drugs in both mother and child. At five (5) months old he was taken to Arkansas Children's Hospital Pediatric and Reconstructive Craneo Maxillo-Facial surgery clinic. It was recommended *747 to have physical therapy and a helmet for the treatment of Plagiocephaly and Torticolis. This recommendation was not followed through by the mother. After several visits, [H.A.] did not arrive at his appointments.
[H.A.] was enrolled in several programs to help his condition. Bost, AHEC, and Gregory Kistler Center, all at the local level, reported that he was dropped from the program because excessive no-shows.
A PACE evaluation given on July 8, 2015, when [H.A.] was 2 years and 4 months old showed him to be at a 17 month old level.
CASA reported the following current facts:
The parents are now living in a house, and have a vehicle. The vehicle does not have a license plate. Neither have a driver's license. James Allen admits he has driven for years just has never had a license. James Allen is unemployed again. Aleisha Bankston is drawing SSI.
They still have the Child Neglect charges pending. They entered a plea of "guilty" and were ordered to spend 30 days in jail in June, 2016. This was appealed, and then the case continued.
It is apparent to CASA they have no regard for the law.
[H.A.] is progressing with the foster family. He receives PT, OT and speech therapy at the Forrester Davis Center. The foster parent takes him to all his appointments, and transports him to the DHS office for visitation.
[H.A.] was moved up in his class at Forrester Davis in November and is having trouble adjusting to the larger class. It takes him a while to adjust to changes in his life. He is doing very well with the Foster Family and their family. He is learning from the other children.
Recently [H.A.] has received new prescription eye glasses, and has regular dental check ups. He is taken to the doctor for regular check ups and any other needs.
In recommending termination of Allen's and Bankston's parental rights, CASA reported that it was concerned with the parents' instability and continued legal issues, which could be detrimental to H.A.'s development. CASA further noted that H.A. needed constant care, supervision, and consistency in the medical treatment he is receiving.
Bankston testified that she had been brushing H.A.'s teeth but that they were nevertheless decaying because he has a genetic condition. According to Bankston, H.A. had a dentist appointment scheduled for two weeks after he had been taken away by DHS, but he had not been to see a dentist before that. Dr. Marty Hardison, a dentist, testified that he had seen H.A. six times and that the child had four teeth that were decayed and in need of crowning. He said that the decay was "fairly deep" but not into the nerves yet. Dr. Hardison testified that, although genetics can play a role in tooth decay, he did not think that was the case with H.A. He stated that between August 2015 when he first saw H.A. and March 2016 when he was referred for crowns, H.A.'s teeth had gotten "worse, to some degree." He said that, since receiving crowns, there had been no more tooth decay. Dr. Hardison said that he had delayed a referral for crowns because of H.A.'s young age.
Bankston admitted smoking marijuana while she was pregnant with H.A. She said that DHS had provided her a referral for a drug-and-alcohol assessment "way later on in the case" and that she had completed the assessment and the recommended outpatient treatment. Bankston said that she had submitted to a hair-follicle drug test but had refused to submit to the "benzos" test because she "just didn't want to."
*748 Allen stated that when he went for hair-follicle drug testing, he had been asked to take a test for "benzos" but that he had refused because he claimed that a DHS caseworker had been ordered by the court to stop testing him any other way but by hair-follicle drug testing. The trial court interjected and denied having given any such order. Allen testified that his referral for a drug-and-alcohol assessment had been dated February 2016. Loretta Dunn, an employee of Paramedical Services, testified that Allen and Bankston had told her that they could not make their appointment for their "benzos" test because they did not have transportation. She said that the parents had requested that it be rescheduled but that they had not shown up for that appointment.
McKay said that Bankston's drug test on July 20, 2015, was positive for THC; that on September 2, 2015, the test was negative; that on October 21, 2015, the test was negative; that on April 6, 2016, the test was positive for opiates, oxycodone, and THC; that her test on December 14, 2016, was negative; and that her hair-follicle tests in June 2016 and January 2017 were negative. She said that Allen's drug screen on July 20, 2015, was positive for THC; that on August 3, 2015, his test was negative; that on October 21, 2015, the test was positive for THC; that on April 6, 2016, the test was abnormal; and that on December 14, 2016, the test was abnormal. McKay said that the parents' first "benzos" test had been scheduled for January 13, 2017, but that the parents did not have a ride; that the second appointment had been scheduled for January 18, 2017, and that, while the parents had submitted to the hair-follicle tests, they had refused the "benzos" test; and that the "benzos" test was rescheduled for February 10, 2017, and that the parents did not make that appointment. McKay said that she did not reschedule after that and did not inform the parents of the rescheduled date arranged by Paramedical Services and DHS's financial coordinator because she would not have allowed the parents to submit to a test that they had planned to take.
Dr. Aaron White, a family practitioner with training in reading and interpreting drug tests, testified that a urine test tells of most recent drug use, while a hair-follicle test covers an extended period-about a ninety-day detection window. In summarizing the results of the parents' drug tests, Dr. White said that there was "good evidence" that Bankston had been using marijuana before April 2016 but "no good evidence" after that period, and there was "good evidence" that Allen had been using marijuana before October 2015 but "no good evidence" after that period.
Bankston testified that she has lived at her new residence for five or six months. Before living at the new residence, she had stayed with her grandmother, at a dog-rescue shelter until it had closed, and in her ex-husband's apartment. Both parents testified that CASA had visited the new home five or six times but that DHS had visited the home only one day before the hearing. Allen testified that he and Bankston are not married but have been living together for approximately six years. He said that no one had discussed with him anything that he needed to change in the new home and that DHS had "actually seemed content." He testified that he and Bankston smoke cigarettes and that he smokes a pack every day. McKay testified that for the first year that the case was open, Allen and Bankston did not have appropriate housing. She said that they have been in their current home since June 2016. She described the home as "very small." She said that a utility room had been converted into a bedroom for H.A. She said that H.A.'s room was cold and that there were space heaters in the *749 living room. McKay said that she had observed dirty dishes in the sink, a lot of clutter on the kitchen table, and "hundreds" of cigarette butts on the ground outside the home. She said that the current home's condition was cluttered but "not horrid." She saw a few safety issues in having medications and a cigarette lighter within the child's reach.
Bankston stated that she is not employed but draws $738 a month in disability benefits. Allen stated that he is currently unemployed. He said that his employment ended due to health reasons but then said that he had been terminated for extended leaves of absence in that he had missed almost a month from work. Allen said that the reason his employer had terminated him was "wrong" and that he is drawing unemployment benefits in the amount of $81 a week. He said that he intends to file for disability at a later date, but he later testified that he had already applied for disability but had been denied.
Bankston testified that she and Allen now have transportation in that they had bought a van a couple of months before the hearing. She admitted that the van is not insured and does not have tags. She stated that she still does not have a driver's license but that there is nothing preventing her from getting a driver's license and that she could go take the test that day. Bankston said that her grandmother drives them where they need to go. Allen testified that he had previously failed a driver's test but that he now has a driver's permit and will get his license within probably two to three weeks. Julia Hollis, Bankston's grandmother, testified that she helps Allen and Bankston, mainly with transportation but also with "a little financial help until they [get] some money coming in." She said that early on in the case she and Bankston had an argument; they had separated for a while because Hollis "felt like [she] needed to step back and they needed to both step up and take their own responsibility." She said, however, that she is willing to provide them with transportation for as long as they need it and is willing to take H.A. to appointments.
Bankston agreed that she still has pending criminal charges but stated that she has appealed. Allen said that his next court date for his criminal charges is thirty days away because he had gotten a continuance. He explained that "they are following the outcome of this right here is what they're doing, they are postponing so that the misdemeanor will follow this court date."
McKay testified that she had been present for some of the visits between H.A. and his parents and that she did not see a bond in that H.A. did not appear to recognize them as his parents. She said that H.A. is just as happy to play with her as he is to visit with his parents. She said that, when the visits are over, H.A. runs straight out to the lobby to his foster father and is ready to go. McKay said that, although H.A. has special needs, H.A. is adoptable. She said that his foster parents are considering adopting him. She said that H.A. still has medical issues in that he needs speech therapy, occupational therapy, and physical therapy to help with his developmental delays. She said that she is concerned that the parents are not taking proper care of themselves to ensure that they are healthy enough to take care of H.A.
Bankston testified that her health is "wonderful." She said that she has diabetes, high-blood pressure, and stomach issues but that they are "under control." She added that she has anxiety and depression since H.A. had been taken by DHS. She admitted missing visits with H.A. in early spring but said that she had been sick during that time. She conceded that she was not "doing very well" in the beginning *750 of the case but that she had finally gotten "a doctor who would do his job." She said that she takes eight or nine medications and that her medications had "stabilized." Bankston stated that she had been made aware of only two medical appointments for H.A.-she attended one but missed the other one because she could not get there given that she was in the emergency room. Bankston said that she and Allen had made inquiries at the Gregory Kistler Treatment Center about an appointment for their son in the event he is allowed to return home.
Allen testified that he has COPD, or chronic obstructive pulmonary disease, had his esophagus "opened up" recently, and has issues with his heart, liver, and stomach. He agreed that he has health problems but stated that he is under a doctor's care and that his medical issues are being "handled." Allen said that he has two cardiologists and that, although he was supposed to have had a stress test because they thought he might have been having a heart attack, he had not gone back to take the test. He said that the cardiologists had also wanted to admit him to the hospital but that he had refused to stay. McKay said that she was shocked by Bankston's testimony that she is healthy and said that Allen had described himself to her as "a ticking time bomb."
Allen further testified that he cannot see his primary-care physician because he has an outstanding balance of $185. Allen stated that he has a stack of unpaid medical bills at home and guessed that he owes a few thousand dollars. He testified that he does not always go for his follow-up appointments because "you know, you change doctors and so forth." He also said that he did not follow up because he owed money, was required to pay cash up front, and could not afford to go back. Allen stated that he does not have any payment plans in place with the doctors or hospitals. Allen was asked, "So let's say your child needed medical attention and you don't have enough money-?" Allen responded, "Well, that's totally different there," explaining that H.A. does not have a copay for visits.
III. Order Terminating Parental Rights
Pursuant to Ark. Code Ann. § 9-27-341(b)(3) (Supp. 2017), an order forever terminating parental rights shall be based on a finding by clear and convincing evidence that it is in the best interest of the juvenile, including consideration of the likelihood that the juvenile will be adopted if the termination petition is granted and the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A). The order must also find by clear and convincing evidence one or more grounds. Ark. Code Ann. § 9-27-341(b)(3)(B).
On June 2, 2017, the trial court entered its order terminating the parental rights of both parents. The trial court found that termination was in H.A.'s best interest, considering adoptability and potential harm, and found three grounds for termination, as alleged by DHS in its petition. Those grounds include: Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(a) (twelve-month failure to remedy); Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(a) (subsequent factors); and Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)(a)(3)(A) & (B) (aggravated circumstances).
IV. Standard of Review
We review termination-of-parental-rights cases de novo. Williams v. Ark. Dep't of Human Servs. , 2013 Ark. App. 622, 2013 WL 5872757. Grounds for termination of parental rights must be proved by clear and convincing evidence, which is *751 that degree of proof that will produce in the finder of fact a firm conviction of the allegation sought to be established. Id. The appellate inquiry is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. Id. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. Id. In resolving the clearly erroneous question, we give due regard to the opportunity of the trial court to judge the credibility of witnesses. Camarillo-Cox v. Ark. Dep't of Human Servs. , 360 Ark. 340, 201 S.W.3d 391 (2005). On appellate review, this court gives a high degree of deference to the trial court, which is in a far superior position to observe the parties before it. Id. Termination of parental rights is an extreme remedy and in derogation of the natural rights of parents, but parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. Friend v. Ark. Dep't of Human Servs. , 2009 Ark. App. 606, 344 S.W.3d 670.
V. Discussion
A. Statutory Grounds
Proof of only one statutory ground is sufficient to terminate parental rights. Sharks v. Ark. Dep't of Human Servs. , 2016 Ark. App. 435, 502 S.W.3d 569. We affirm the termination order as to both parents under the aggravated-circumstances ground. Arkansas Code Annotated section 9-27-341(b)(3)(B)(ix)(a)(3) provides as a ground that the parent is found by a court of competent jurisdiction to have subjected any juvenile to aggravated circumstances, which means, among other things, that a determination has been or is made by a judge that there is little likelihood that services to the family will result in successful reunification. Under this ground, DHS alleged in its petition that
[t]he parents have completed most of the services that were asked of them. However, they did not do so until the permanency planning hearing and a concurrent goal of adoption following termination was added to the case. The parents have not shown stability in housing, employment, or transportation and have not developed a strong bond with the juvenile. The parents still have criminal charges pending from the beginning of the case. The mother has been in [and] out of hospital ERs and has not been able to handle her own health. It is unlikely that given the extensive needs of the juvenile, those needs would be met by the parents. The parents missed a number of visits for a period of time and it was only until family forced them to come that they resumed visits. Visitation was inconsistent, at best, from around September 2015 until mid-March 2016. It is unlikely that given more time and services that the juvenile would be able to successfully reunify with his parents given the needs of the juvenile and the parents.
The trial court specifically found that there was little likelihood that services to the family would result in successful reunification. The trial court found that both parents have had extensive health issues throughout the pendency of the case in that Bankston has been hospitalized and bedridden at times and that Allen has significant health issues but does not follow his doctors' advice. The trial court noted that H.A. needs speech, occupational, and physical therapies; that he is four years old but functioning as a much younger child; and that he is under a physician's care to monitor the shape of his head. The trial court found, "Based on the parents' continued inability to adequately take care of their own health needs and *752 the fact that they willfully failed to care for the juvenile's significant medical and dental needs, the Court has serious concerns regarding their ability to properly care for this child."
1. Allen
Allen argues that the trial court's concern was not that he is too sick to care for H.A. but that "because he doesn't properly take care of himself, then he likely would not care enough to take care of H.A.'s medical needs." He first argues that how a parent addresses his own health is not a valid indicator of how he will address his child's health and that he has a fundamental liberty interest in refusing medical care for himself. Allen asserts that the trial court's finding that he will not care for his child's medical needs is speculative. Allen also argues that this ground assumes that he has received initial services, which he did not, and points out that DHS did not offer him any services "to encourage/force/entice him to better address his own medical needs."
McKay testified that Allen had described himself as "a ticking time bomb" in terms of his health. Allen, who has heart issues, testified at the termination hearing that he had been advised by doctors that he needed to undergo a stress test and that he should have been admitted to the hospital. Allen conceded that he had disregarded that advice. Also, Allen has COPD, yet he smokes a pack of cigarettes every day. In Jones v. Arkansas Department of Human Services , 361 Ark. 164, 205 S.W.3d 778 (2005), our supreme court affirmed the termination of parental rights because the mother had "repeatedly exercised poor judgment, especially with regard to her own health needs." Id. at 185, 205 S.W.3d at 790.
Allen has a right to refuse medical treatment, but the evidence showed that he had also disregarded medical advice about H.A.'s needs. H.A.'s doctor had prescribed a helmet to treat an issue with the child's misshapen head. Allen decided that wearing the helmet was harmful to H.A. and discontinued its use contrary to medical advice. Moreover, when H.A. was born, doctors had advised the parents that H.A. was developmentally delayed and needed therapies to address those delays. There was evidence that H.A. had been dropped from various treatment centers because of excessive no-shows.
Allen complains that DHS did not offer him any services designed to encourage him to take care of his health. Allen does not articulate what particular services that DHS could have offered him to accomplish this, and we know of no such services. Besides, Allen pointed out that he has a right to refuse medical treatment. Being physically and mentally healthy-in order to be capable of taking care of his child and the child's health needs-should be enough of an incentive. Here, the trial court repeatedly found that DHS had made reasonable efforts to provide family services, including parenting classes, counseling, transportation assistance, drug testing, drug-and-alcohol assessments, drug treatment, HUD assistance, and visitation. We cannot say that the trial court clearly erred in terminating Allen's parental rights to H.A. on the aggravated-circumstances ground.
2. Bankston
Bankston argues that she did everything that was requested of her in that she completed drug treatment; she had not tested positive for drugs for ten months; she completed parenting classes; she visited H.A. and went to his medical appointments; she sought out services for H.A.; she attended court and two case-plan staffings; she acquired disability income; she bought a vehicle; and she was clearly *753 able to find transportation despite not having a driver's license. Bankston complied with the case plan, for the most part, but even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child. Shaffer v. Ark. Dep't of Human Servs. , 2016 Ark. App. 208, 489 S.W.3d 182.
Bankston contends that it is "undisputed that there were no services offered to her to alleviate the concerns regarding her health or H.A.'s care or budgeting." Bankston does not indicate what particular services DHS could have offered her to maintain her own health, and we know of no such services. As for H.A.'s care, Bankston attended only one of two medical appointments for H.A. She first claimed that she had not received notice of the second appointment but later said that she could not attend because she was in the emergency room. There was no evidence that Bankston needed assistance with budgeting-only that she needed to obtain income, which she did through acquiring disability benefits, and she testified that her grandmother controlled her disability check. Here, the trial court repeatedly found that DHS had made reasonable efforts to provide family services.
Bankston further argues that it was speculative for the trial court to terminate her parental rights because DHS did not prove that her medical conditions impaired her ability to safely parent H.A. DHS did not need medical records or testimony to show that Bankston's health interfered with her ability to parent H.A. That came from Bankston's own testimony or what she reported to others. Bankston testified that she had missed a substantial number of visits with H.A. because she was sick; that she was too sick to get out of bed to clean her house; that she had failed to take H.A. to therapy because her "health got in the way"; and that she had missed a doctor's appointment for H.A. because she was in the emergency room. We are not left with a definite and firm conviction that the trial court made a mistake in terminating Bankston's parental rights to H.A. on the aggravated-circumstances ground.
B. Best-Interest Determination
Two factors to consider in determining best interest are the likelihood of adoption and the potential harm caused by returning the child to the custody of his or her parents. See Ark. Code Ann. § 9-27-341(b)(3)(A). Neither parent challenges the trial court's finding that H.A. is adoptable. Instead, they both argue that the trial court erred in finding that there was potential harm in returning H.A. to their custody. The trial court was not required to find that actual harm would occur if the child was returned to the parents, nor was it required to affirmatively identify a potential harm. Curtis v. Ark. Dep't of Human Servs. , 2017 Ark. App. 465, 527 S.W.3d 762. The potential-harm evidence must be viewed in a forward-looking manner and considered in broad terms. Harbin v. Ark. Dep't of Human Servs. , 2014 Ark. App. 715, 451 S.W.3d 231. In determining potential harm, the trial court may consider past behavior as a predictor of likely potential harm should the child be returned to the parent's care and custody. Id.
Allen and Bankston point out their accomplishments; for example, they have a stable and appropriate home, they have income, they have transportation or a transportation plan, and they are not using drugs. Allen further asserts that H.A. is not "a medically fragile child" in that he is to have annual follow-ups on his misshapen skull, he needs normal dental visits, and he needs to be enrolled in developmental daycare, about which he and Bankston have already made inquiries. Both parents also *754 complain that DHS failed to offer appropriate services. Specifically, Allen claims that he was not offered medical-education services, and Bankston claims that she was not offered services to maintain an appropriate home or services "to learn all the necessary requirements to parent J.H. [sic] to DHS and the trial court's satisfaction."
The trial court's weighing the evidence differently than the parents wanted it weighed is not reversible error. Cox v. Ark. Dep't of Human Servs. , 2015 Ark. App. 202, 462 S.W.3d 670. To reverse on this basis would require this court to act as a super fact-finder or second-guess the trial court's credibility determination, which is not our function. Id.
The parents have a history of neglecting H.A.'s medical and dental needs, which represents potential harm. Gulley v. Ark. Dep't of Human Servs. , 2016 Ark. App. 367, at 9, 498 S.W.3d 754, 760 ("A parent's past behavior is often a good indicator of future behavior."). There was testimony that H.A. will not reach his full potential if he does not continue to receive therapies to address his developmental delays. This is potential harm.
As for services, Allen was invited to attend two medical appointments for H.A., but his attendance was excused after he said that he could not attend due to his work schedule. Bankston says that she was not given home services, but the trial court concluded that she had an appropriate, albeit small, home. She also asserts that she was not given services to learn how to parent H.A., but she was offered and completed parenting classes.
The purpose of the termination-of-parental-rights statute, Ark. Code Ann. § 9-27-341(a)(3), is to provide permanency in a juvenile's life in all instances in which the return of a juvenile to the family home is contrary to the juvenile's health, safety, or welfare, and it appears from the evidence that a return to the family home cannot be accomplished in a reasonable period of time, as viewed from the juvenile's perspective. We note that H.A. has been out of his parents' custody for over two years, and there was testimony that H.A. did not appear to have a strong bond with his parents during visits. On the other hand, there was testimony that H.A. is with foster parents who are considering adopting him and that they have seen to all his developmental delays and his medical and dental needs. Under these circumstances, we cannot say that the trial court clearly erred in finding that termination of parental rights was in H.A.'s best interest.
Affirmed.
Glover and Brown, JJ., agree.