Cite as 2020 Ark. App. 24

# ARKANSAS COURT OF APPEALS

DIVISION IV
**No.** CV-19-680

| | |
|---|---|
| LADONNA HUDDLESTON<br><br>APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN<br><br>APPELLEES | **Opinion Delivered** January 15, 2020<br><br>APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT<br>[NO. 72JV-17-699]<br><br>HONORABLE STACEY ZIMMERMAN, JUDGE<br><br>AFFIRMED |

## LARRY D. VAUGHT, Judge

Ladonna Huddleston appeals the order entered by the Washington County Circuit Court terminating her parental rights to AH (born August 9, 2015) and ID (born September 29, 2010). On appeal, Huddleston argues that the circuit court clearly erred in finding grounds supported the termination decision and erred in finding that termination was in the best interest of AH and ID. We affirm.

On September 8, 2017, ID disclosed to law enforcement that Huddleston's boyfriend, Will Hadley, had sexually abused her. Huddleston told representatives of the Arkansas Department of Human Services (DHS) that she was unaware of the abuse and that she would protect her children. On September 11, during a follow-up check, it was discovered that ID had a red mark on her face. ID reported that Huddleston had struck her as

punishment for reporting the abuse. ID further reported that Hadley had been in Huddleston's home that morning. DHS removed ID, AH, and JD[1] from Huddleston's custody and placed them in foster care. On September 13, DHS filed a petition for emergency custody and dependency-neglect of all three children, and the circuit court entered an order granting the petition that day. On October 25, the circuit court ordered DHS to place JD in inpatient residential treatment after finding that he had been running away from school and had disrupted two foster-care placements.

After an adjudication hearing, the court entered an order on November 2, finding that the children were dependent-neglected and at substantial risk of serious harm as a result of abuse, sexual abuse, and parental unfitness. The court ordered Huddleston to, among other things, cooperate with DHS, participate in individual counseling, refrain from illegal drug use, submit to random drug screens, obtain and maintain stable housing and employment, demonstrate the ability to protect her children, follow the case plan and court orders, and "not let people stay at her home—Mother needs to show that she can make GOOD choices about what people she has around her and her kids!!" The goal of the case was reunification.

On February 21, 2018, the circuit court held a review hearing wherein it found Huddleston had maintained contact with DHS, participated in counseling, submitted to drug screens, tested negative for illegal substances, secured housing and (disability) income, and was in parenting classes. The court ordered Huddleston to continue to comply with the case plan and "keep other people out of the home!!" The court found that Huddleston "is

---

[1]JD (born November 20, 2008) is also Huddleston's child.

2

continuing to develop her parenting skills and is working, but not yet shown, she will adequately protect the juveniles from harm."

On March 8, the circuit court entered a review order that discharged JD from his treatment facility and ordered a trial home placement with Huddleston to begin on March 9. The order provided that "[n]o one other than the Mother and [JD] shall spend the night in the home!"

After an emergency hearing on April 11, the circuit court entered an order ending JD's trial home placement. The court's order described a "meltdown" JD had in court along with multiple behavioral issues he had at school.[2] The order also set forth Huddleston's testimony at the emergency hearing that she allowed a man named Christian in her home during the trial placement. The court found that JD was a danger to himself and others and ordered that he be placed in an acute treatment facility.

In a July 26 review order, the circuit court found Huddleston in partial compliance with the case plan and court orders; however, the court also found that she failed to demonstrate the ability to keep her children safe and that she failed to complete parenting classes and counseling. The circuit court also found that it was in the best interest of AH and ID to be placed separately from JD due to his severe mental-health issues. The court continued the goal of reunification.

After permanency-planning hearings on September 5 and October 4, the court found that Huddleston had partially complied with the case plan but had not demonstrated an

---

[2]JD had been running away from school, hiding inside school, pulling the fire alarm, getting into fights, and displaying aggressive and violent behavior toward the students and staff. He had also been suspended from school.

ability to protect the children and keep them safe from harm. The court found that JD's trial home placement had ended because Huddleston failed to keep men out of her home, which was the cause of removal. The court again found that it was not in AH and ID's best interest to be placed with JD. The court changed the goal to adoption for all three children.

On December 3, the circuit court entered an agreed order wherein it found that ID had disrupted the placement with her foster family. The court authorized DHS to move her to an inpatient treatment facility.

On February 4, 2019, DHS filed a petition to terminate Huddleston's parental rights alleging that termination was in the best interest of AH, ID, and JD. DHS also alleged that the failure-to-remedy ground, Arkansas Code Annotated section 9-27-341(b)(3)(B)(i)*(a)*, and the subsequent-factors ground, section 9-27-341(b)(3)(B)(vii), supported termination.

At the May 17 termination hearing, DHS caseworker Chris Hamby testified that all three children were doing well in their respective placements. He said that ID and JD were receiving inpatient treatment at different facilities for their behavioral issues and that AH was placed in a nonadoptive foster home. Hamby opined that all three children are adoptable despite ID's and JD's behavioral issues. Hamby further testified that Huddleston maintained weekly contact with DHS, participated in counseling, submitted to some random drug screens, completed parenting classes, maintained stable housing and income, and visited her children. However, Hamby stated that Huddleston tested positive for methamphetamine, amphetamines, and alcohol in November 2018. Hamby said that Huddleston had been called in for drug screens since February 2019 but had not appeared for testing.

4

Hamby acknowledged that Huddleston loves her children, that she made efforts to comply with the case plan, and that she had shown improvement, but he recommended termination of her parental rights because she had not demonstrated an ability to protect her children. Hamby pointed to "critical mistakes," like the positive drug screen six months prior to the termination hearing and JD's failed trial home placement caused by Huddleston's having Cecil Turner, who has true findings of sexual-abuse allegations against him, in the home. Hamby said DHS's termination recommendation was also based on Huddleston's family's extensive history with DHS.[3]

Alison Overton, the DHS supervisor on Huddleston's case, testified that DHS has been involved in multiple protective-services cases with Huddleston's family since 2007. Overton testified that DHS has provided services "over and over" to Huddleston but that the children still cannot be safely returned to her.

Huddleston testified that she wants her children to come home because she has a bond with them, their visits are good, they call her all the time, and she can care for them. She stated that she has been trying to prove that she is responsible and able to protect them from harm. She introduced a letter from her boss at the Arkansas Veterans Home where she had volunteered the past several weeks. The letter stated that she is a person of good

---

[3]The record reflects that Huddleston's family has had twenty-four referrals for DHS investigations of multiple allegations, including environmental neglect, inadequate supervision, poison/noxious substance exposure, striking a child in the face or with a closed fist, failure to protect, cuts/welts/bruises, inadequate food, sexual abuse, educational neglect, threat of harm, throwing a child, abuse with a deadly weapon, and indecent exposure. As a result, DHS has opened multiple protective-services and differential-response cases on Huddleston's family over the years.

character, she is compassionate and kind with the residents, and while she had made some bad decisions in the past, she is remorseful and able to be a wonderful mother.

Huddleston explained that her positive drug screen was the result of her being depressed and "hanging out with the wrong crowd." She stated that she had appeared for all drug screens since February except one, which she missed due to a tornado warning.

Court appointed special advocate (CASA) Susan Hantz acknowledged the love between Huddleston and her children and that Huddleston's efforts in this case were "impressive." Hantz testified that Huddleston completed the treatment plans, parenting classes, and counseling and that she attended visits, maintained housing, and contacted DHS weekly.

Hantz recommended that JD be returned to his mother's care because JD had been in residential care for fifteen months, and Huddleston was his only source of love and support. Hantz said that JD would be significantly harmed if he were to lose his mother. Hantz's recommendations regarding AH and ID were not as clear. Hantz initially recommended that Huddleston's parental rights be terminated to AH and ID because Huddleston had not accepted her role in and responsibility for protecting her family from sexual predators, and she has not demonstrated the capacity to protect her daughters from potential threats. However, later in her testimony, Hantz stated that in light of Huddleston's progress, she would recommend keeping the case open. Thereafter, Hantz testified that she was concerned that DHS had been involved with Huddleston's family since 2007 and that Huddleston had tested positive for drugs.

6

Alicia, the foster mother for AH and ID, testified that she had custody of both children from January 2018 to December 2018, when ID was placed in an inpatient treatment facility. Alicia stated that AH has made a lot of progress and that her progress intensified when ID left the home. Alicia testified that she is not an adoptive home but that she is willing to continue to foster AH. Alicia stated that ID requires a lot of therapeutic and medical treatment that she can only get in a residential facility and that ID is just starting to "scratch the surface of her trauma." Alicia said that she is willing to continue to visit and support ID.

At the conclusion of the hearing, the circuit court orally found DHS had proved that the failure-to-remedy and subsequent-factors grounds supported termination of Huddleston's parental rights to all three children. The court also found that termination was in the best interest of AH and ID. Accordingly, the court granted DHS's petition as to AH and ID. Regarding JD, the court found that termination would be detrimental to his mental health and was not in his best interest. Accordingly, the court denied DHS's petition with respect to JD. On June 14, 2019, the circuit court entered an order memorializing its oral findings. Huddleston appeals the order.[4]

A circuit court's order terminating parental rights must be based on findings proved by clear and convincing evidence. *Bolden v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 218, at 7, 547 S.W.3d 129, 133 (citing *Krecker v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 537, at 10, 530 S.W.3d 393, 400; Ark. Code Ann. § 9-27-341(b)(3) (Repl. 2015)). Clear and convincing evidence is defined as that degree of proof that will produce in the fact-finder a

---

[4]This order also terminated the parental rights of Jimmy Davis, the father of ID. Davis is not a party to this appeal.

7

firm conviction as to the allegation sought to be established. *Bolden*, 2018 Ark. App. 218, at 7, 547 S.W.3d at 133. On appeal, the appellate court reviews termination-of-parental-rights cases de novo but will not reverse the circuit court's ruling unless its findings are clearly erroneous. *Id.*, 547 S.W.3d at 133. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.*, 547 S.W.3d at 133. In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the circuit court to judge the credibility of witnesses. *Id.*, 547 S.W.3d at 133. The appellate court is not to act as a "super factfinder," substituting its own judgment or second-guessing the credibility determinations of the circuit court; we reverse only in those cases in which a definite mistake has occurred. *Id.*, 547 S.W.3d at 133–34.

An order terminating parental rights must be based on a showing of clear and convincing evidence of grounds for termination. Ark. Code Ann. § 9-27-341(b)(3)(B) (Supp. 2017). Huddleston argues that the circuit court clearly erred in finding that DHS proved the two grounds alleged in its petition. One of those grounds is the failure-to-remedy ground, which provides that parental rights may be terminated when a juvenile has been adjudicated by the court to be dependent-neglected and has continued to be out of the custody of the parent for twelve months, and despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent. Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(a)*.

We hold that the circuit court did not clearly err in finding that Huddleston failed to remedy the conditions that caused removal. The court found that the children had been out

8

of Huddleston's custody for twelve months and that DHS had made reasonable and meaningful efforts to provide family services to Huddleston, yet she failed to demonstrate the ability to protect her children and keep them safe from harm. This case began after it was discovered that Huddleston's boyfriend had sexually abused ID, and Huddleston failed to protect her. All through these proceedings, Huddleston was specifically ordered to not let people stay in her home and to make good choices about the people around her and her kids. Despite these court-ordered directives, Huddleston allowed two men into her home during JD's trial home placement: Turner, who has a child-maltreatment history, and a man named Christian. A year into her case, Huddleston admitted "hanging out with the wrong crowd" with whom she consumed methamphetamine, amphetamines, and alcohol. Hamby and Overton testified that Huddleston had not remedied the conditions that caused removal. Finally, the circuit court found that DHS had been involved with Huddleston's family since 2007 and that DHS had been providing services to the family in this case and in a "plethora" of protective-services cases. A parent's past behavior is often a good indicator of future behavior. *Wright v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 503, at 12, 560 S.W.3d 827, 834.

Huddleston argues that the circuit court erred in giving too much weight to the failed trial home placement because it occurred a year before the termination hearing and that the court erred in not giving enough weight to the testimony of the CASA worker and the foster mother along with the letter from her boss—all of whom were impressed with Huddleston's efforts. However, the circuit court's weighing the evidence differently than the parent wanted it weighed is not reversible error. *Allen v. Ark. Dep't of Human Servs.*, 2018 Ark. App.

9

136, at 20, 540 S.W.3d 742, 754 (citing *Cox v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 202, 462 S.W.3d 670). To reverse on these arguments would require this court to act as a super fact-finder or second-guess the circuit court's credibility determinations, which is not our function. *Id.*, 540 S.W.3d at 754.

Huddleston next contends that the circuit court clearly erred in finding that she will continue the pattern of prioritizing her inappropriate romantic relationships over the safety of her children because there is no evidence in this case that she has been in a romantic relationship with anyone since the case began. Whether Huddleston has been in a romantic relationship during this case is not relevant. The cause for removal was Huddleston's failure to protect her children from inappropriate individuals, and the evidence supports the court's finding that Huddleston has failed to remedy this problem. *Hernandez v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 250, 492 S.W.3d 119 (affirming a failure-to-remedy finding where the children, victims of physical and sexual abuse, were removed from the appellant's custody in part because she permitted unfamiliar adults and minors to live in the home and care for the children, and the evidence showed that she continued to do so during the case).

We acknowledge that the circuit court found that Huddleston did not complete parenting classes and counseling despite evidence from Hamby and Hantz that she did. Assuming arguendo that Huddleston did complete these directives, the circuit court also found that Huddleston did not achieve the intended goal of parenting classes and counseling because she continued to make poor decisions to the detriment of her children. "What matters is whether completion of the case plan achieved the intended result of making the parent capable of caring for the child—mere compliance with directives of the court and

DHS is not sufficient if the root cause of the problem is not dealt with." *Cole v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 203, at 7–8, 394 S.W.3d 318, 322 (affirming failure-to-remedy finding on the basis of evidence that the appellant showed no progress in the single most crucial component of her case—demonstrating that she could protect and care for her son, who had suffered severe physical abuse at the hands of her boyfriend).

In light of the evidence in this case, we cannot say that the circuit court clearly erred in finding the failure-to-remedy ground supported the court's termination decision. Because only one ground must be proved to support termination, *Hernandez*, 2016 Ark. App. 250, at 6, 492 S.W.3d at 123, we need not address Huddleston's arguments regarding the subsequent-factors ground.

In order to terminate parental rights, a circuit court must also find by clear and convincing evidence that termination is in the best interest of the child, taking into consideration (1) the likelihood that the child will be adopted if the termination petition is granted and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii). The circuit court is not required to find that actual harm would result or to affirmatively identify a potential harm. *Hernandez*, 2016 Ark. App. 250, at 9–10, 492 S.W.3d at 125. The circuit court must consider a parent's compliance and behavior during the entire dependency-neglect case as well as the evidence presented at the termination hearing to decide whether the termination is in the children's best interest. *Allen-Grace v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 286, at 8, 577 S.W.3d 397, 401 (citing Ark. Code Ann. § 9-27-341(a)(4)(B) (Supp. 2017)).

Huddleston argues that the circuit court clearly erred in finding that terminating her parental rights was in the best interest of AH and ID. She does not challenge the adoptability finding, but she does challenge the potential-harm finding, contending that she was in full compliance of the case plan. We disagree.

The evidence in this case demonstrates that Huddleston did not comply with the case plan and court orders. She allowed Turner and Christian in her home during JD's trial home placement; she spent time with inappropriate people, which, according to her, led to her testing positive for illegal drugs and alcohol; and she has refused to appear for drug screens since February 2019. Hamby and Overton testified that because of these failures, AH and ID would be at risk of harm if returned to Huddleston's custody, and Hantz testified that Huddleston has not demonstrated the capacity to protect her daughters from potential threats.

These failures are fundamental in that her children were removed from her custody because she allowed inappropriate people to be around her children, which led to the sexual abuse of ID. In addition, there is evidence that Huddleston has not acknowledged the abuse suffered by ID and has not accepted her role in the abuse ID suffered. In *Cole*, we held that this failure alone supported a finding that returning the child to the parent presented a substantial risk of serious harm and is therefore not in the child's best interest. 2012 Ark. App. 203, at 7, 394 S.W.3d at 322.

Huddleston next argues that the circuit court's best-interest finding must be reversed because the court failed to consider the impact termination will have on the relationships between AH, ID, and JD. Keeping siblings together is an important consideration but is not

outcome determinative, as the best interest of each child is the polestar consideration. *Brown v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 370, at 10–11, 584 S.W.3d 276, 282.

The circuit court in its order did not make express findings on the impact termination will have on the sibling relationships between AH, ID, and JD, but reversal is not required on this basis alone. *Brown*, 2019 Ark. App. 370, at 10–12, 584 S.W.3d at 282–83. Throughout this case, the circuit court entered orders finding that it was in the best interest of AH and ID to be separated from JD due to his volatile behavior. A report from JD's current treatment facility provides that in the six months JD resided there, he was involved in nineteen incidents wherein he was physically abusive to himself or others. Although the CASA report provides that AH had missed seeing JD, this same report nevertheless recommends termination of Huddleston's parental rights to AH and ID. Further, the evidence demonstrates that despite the fact that AH and ID had not seen JD in six months, they were both improving in their separate placements. Therefore, the facts in this case do not support Huddleston's argument that terminating Huddleston's parental rights to AH and ID will negatively affect their relationship with JD.

As between AH and ID, Huddleston argues that if ID's treatment fails to progress, her ability to be adopted could be impacted, which could put AH and ID at risk of not being adopted together. The evidence directly contradicts this argument. Hamby testified that ID, despite her behavioral issues, is "very much" adoptable. He said that she is a "terrific girl" and that she is "very fun to be around."    For all these reasons, we hold that the circuit court did not clearly err in finding that it was in the best interest of AH and ID to terminate Huddleston's parental rights. Therefore, we affirm.

13

Affirmed.

VIRDEN and GLADWIN, JJ., agree.

*Tabitha McNulty*, Arkansas Commission for Parent Counsel, for appellant.

*Ellan K. Howard*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor children.